## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STEPHANIE TABOR, Individually And On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>BODISEN BIOTECH, INC., BO CHEN, WANG CHUNSHENG, KAREN QIONG WANG, YILIANG LAI, and KABANI & CO., INC.<br><br>Defendants. | **CIVIL ACTION NO. 06-CV-13220**<br><br>**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

### INTRODUCTION

1.      This action is brought on behalf of a class of purchasers of the common stock of Bodisen Biotech, Inc. ("Bodisen" or the "Company") between November 3, 2005, and November 10, 2006, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act"). As alleged herein, Defendants published a series of materially false and misleading statements that Defendants knew and/or recklessly disregarded were materially false and misleading at the time of such publication and that omitted to reveal material information necessary to make Defendants' statements, in light of such material omissions, not materially false and misleading.

### JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the United States Securities and Exchange Commission ("SEC") [17 C.F.R. § 240.10b-5].

3.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Bodisen common stock is listed on the American Stock Exchange ("AMEX") and trades within the United States, the Company is registered as a United States Corporation, and the Company regularly filed quarterly and year-end financial reports with the SEC.

4.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(d). Bodisen is a foreign or "alien" corporation that does significant business in this District and may properly be sued in any District of the United States, including the Southern District of New York.

5.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

### Lead Plaintiff

6.     Lead Plaintiff the Butterfield Trust Group, including members of the Butterfield Trust and Anteo Quintavalle, were appointed Lead Plaintiff by Order of this Court dated August 13, 2007. As set forth in Plaintiff's initial certifications, incorporated by reference herein, Lead Plaintiff purchased the common stock of Bodisen at artificially inflated prices during the Class Period and has been damaged thereby.

### Corporate Defendant

7.     Defendant Bodisen is a Delaware corporation with its principal place of business located in Xi'an, China. Despite adopting the name "Biotech," in fact, according to its profile located on its website, www.bodisen.com, the Company purportedly engages in the

development, manufacture, and sale of pesticides and compound organic fertilizers in China. The Company purports to manufacture approximately 60 packaged products in 4 product categories: (i) organic compound fertilizer; (ii) organic liquid fertilizers; (iii) pesticides and insecticides; and (iv) agricultural raw materials.

**Individual Defendants**

8.    Defendant Bo Chen ("Chen") was a founder of the Company and during the Class Period served as President and Executive Director of the Company. During the Class Period, Defendant Chen signed the Company's SEC filings, including but not limited to Bodisen's 2005 Form 10-KSB.

9.    Defendant "Karen" Qiong Wang ("Wang") was, during the Class Period, Chairman and Chief Executive Officer of the Company. During the Class Period, Defendant Wang signed the Company's SEC filings, including but not limited to Bodisen's 3Q:05, 1Q:06 and 2Q:06 Form(s) 10-QSB and its 2005 Form 10-KSB.

10.    Defendant Yiliang Lai ("Lai") was, during the Class Period, Chief Financial Officer and Principal Accounting Officer of the Company. During the Class Period, Defendant Lai signed the Company's SEC filings, including but not limited to Bodisen's 3Q:05, 1Q:06, and 2Q:06 Form(s) 10-QSB and its 2005 Form 10-KSB. Defendant Lai resigned from the Company on or about June 4, 2007.

11.    Defendant Wang Chunsheng ("Chunsheng") was, during the Class Period, Chief Operating Officer of the Company. During the Class Period, Defendant Chunsheng signed or assisted in the preparation of the Company's SEC filings, including but not limited to Bodisen's 2005 Form 10-KSB.

12.    The Defendants referenced above in ¶¶ 8-11 are referred to herein as the

"Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

## OVERVIEW OF DEFENDANTS' FRAUDULENT SCHEME

13.    Until its delisting in March of 2007, Bodisen stock was traded on the AMEX. Throughout the Class Period, Bodisen portrayed itself as a profitable environmentally-friendly organic fertilizer company based in China but publicly traded in the United States. The Company purported to have strong internal controls and a clear growth strategy, experienced and competent management, and financial practices that complied with the SEC and AMEX requirements.

14.    This characterization was critical to investors because as a foreign-based, foreign-run company, Bodisen's purported adherence to SEC standards, Generally Accepted Accounting Principles ("GAAP"), and AMEX listing requirements assured investors that the Company was stable and had achieved the transparency of financial results expected from public companies trading in the United States.

15.    Throughout the Class Period, Defendants repeatedly stated that the Company's management and owners were qualified and competent business people, that its results of operations and financial results were accurate, that its internal operational and financial controls were sound, and that its financial statements and reports were prepared in accordance with GAAP and SEC rules. These statements were materially false and misleading, and were known by Defendants to be false or were recklessly disregarded as such thereby, as discussed in detail below. To reach the Company's near-term business objectives, Defendants misled the public as to the Company's profitability, strength, and growth potential, as well as the integrity and conformity of its financial statements with GAAP and the Company's internal financial controls

and accounting.

16.    Defendants' positive statements about the Company, positive financial reports, and concealment of true adverse conditions caused Bodisen shares to trade at a Class Period high above $20.00 by late January 2006. Unbeknownst to investors, however, throughout the Class Period, Bodisen shares had been artificially inflated and the statements made by Defendants were either patently untrue or Defendants recklessly disregarded the true, adverse facts concerning the Company's management, financial compliance, internal controls, strength, profitability, and prospects, which were in stark contrast to its statements made during the Class Period.

17.    In November 2006 the true condition and operational deficiencies of the Company were revealed to investors, and Bodisen's stock price collapsed to below $6.00 per share, from above $10.00 per share immediately before, a decline of over 40% on heavy trading volume of over 6 million shares, over 25 times the average daily trading volume.

18.    Throughout the Class Period, the Company was suffering from a host of undisclosed adverse factors which were negatively impacting Bodisen's business.

**CONCEALED, ADVERSE FACTS CONCERNING THE COMPANY**

**The Company's Relationship with
New York Global Group and Benjamin Wei**

19.    For purposes of public relations and the promotion of the Company's securities in the U.S. market, Bodisen relied heavily on a firm called New York Global Group, Inc. ("NYGG"). NYGG touts itself as an expert on China-related matters serving its (primarily Chinese or China-based) clients in the areas of investments and financing, mergers and acquisitions, economic research, due diligence and background checks, import and export assistance, English language translation services, international trade negotiations and strategic market entry consulting.

20.    As reported in a May 1, 2006 *New York Post* article on NYGG, "the only up-to date information on Bodisen in the U.S." came by way of NYGG, which the article described as "an equally obscure Wall Street investment firm… the only securities firm in the U.S. with an analyst that covers the stock [of Bodisen]."

21.    NYGG's founder and controlling shareholder is Chinese-born Benjamin Wei. On May 1, 2006 *The New York Post* reported on Wei in an article entitled *Stir-Fried Stocks – New York Firm is Touting Murky China Investments*:

> Meanwhile, the folks at New York Global have worked hard to distinguish themselves from the competition in this Wall Street backwater.
>
> But in many respects, the operation is not much different from any of its rivals - from the doubtful value of the merchandise it is promoting to the ongoing struggle of the company's Chinese-born founder and controlling shareholder, Benjamin Wei, to keep both himself and the regulatory skeletons in his closet hidden from view.
>
> In an interview for this column last week, Wei claimed to be just one of several managing directors of New York Global Group, and insisted that there was no particular reason why none of them are listed on the firm's Web site.
>
> Yet records on file with the National Association of Securities Dealers in Washington show plainly enough that Wei is a good deal more than just another suit at the office. Wei's wife, Michaela Perlikova Wei, is listed as the owner of record of the firm. Other records suggest a pretty obvious reason why: Benjamin Wei has a disciplinary history tracing back to the start of his career in the securities industry in 1999 in Oklahoma, where he was fired from his first job at a brokerage firm called Willbanks Securities.
>
> His offense? Refusing to tell his employer the names of clients he was servicing through an investment advisory firm on the side. For this, he was fined $5,000 and temporarily barred from the industry.
>
> NASD records show that although Wei paid the fine, he never applied for reinstatement as an NASD-licensed member, and as such has been barred from soliciting investments from the public, or promoting securities to potential investors. And the rules also prevent him from exercising any sort of direct control over any NASD-licensed firm engaged in such activity.
>
> In last week's interview, Wei insisted that New York Global Group had been set

up specifically as a holding company, with its securities operation as a separate entity, to guarantee and preserve that very separation.

Yet it is hard to see how Wei was engaged in anything other than selling stock to potential investors when he appeared in late February on behalf of Bodisen Biotech at a micro-cap conference sponsored by Roth Capital Corp. in California and regaled a roomful of hedge fund managers and other potential investors regarding the growth opportunities awaiting Bodisen Biotech in the Chinese organic fertilizer business.

22.    On September 29, 2006, another *New York Post* article, entitled *The Curious Past of an Adviser to Emerging Chinese Companies*, further explored Wei's background, the fact that he changed his name from Wei to Wey, his role at NYGG, and Wei's admission that he was instructed to conceal the relationship between NYGG and Bodisen:

Wey was hired by Bodisen less than a year after one of the most enthusiastic promoters of reverse mergers, Timothy Halter, of Dallas-based Halter Financial, claims to have turned down the Bodisen reverse merger. Halter is such a fan of reverse mergers and Chinese stocks that he created an index called the Halter USX China Index. While he liked Bodisen, "and it seemed like a good business," Halter told me, "our auditor ultimately deemed it un-auditable at the time." Bodisen is not in the index.

***

What's his real story and why did he change his name? Burstein, his attorney of a week, says Wey legally changed his name in late 2003 after moving to New York so it would be more "Americanized." He adds that Wey's wife, Czech-born Michaela Wei, who is listed in NASD documents as majority owner of New York Global, intends to change her last name when she becomes a citizen of the U.S.

It's Wey, however, who is the star of the show at New York Global. His company has issued press releases about how he has been named senior economic advisor to multiple Chinese cities, executive director of the Foreign Investment Committee of the Investment Association of China and deputy director of the China Mergers & Acquisitions Association. The front page of firm's website [sic] features a video of Wey "interviewed by Forbes as a China expert."

On the trail of Wey

Yet a search of any pre-New York Global background on "Benjamin Wey" on Google, the NASD's website or New York Global's website comes up empty-handed about Wey's work life before New York Global, which was founded two years ago. Even a press release by New York Global about the naming of Wey as

president offers little in the way of his employment background.

But a search of "Benjamin" and his wife's last name "Wei" provides some insight into his past. Even before getting his MBA in 1999 from the University of Central Oklahoma, Benjamin Tianbing Wei became an investment advisor and started an investment advisory firm in Oklahoma. He quickly became somewhat of a business celebrity in Oklahoma, where his China investment banking ideas helped him rub shoulders with Oklahoma's business elite; he even claims that he became "an informal advisor" on China affairs to Oklahoma's governor.

Then, in 2002, he ran into trouble with securities regulators, including a brief suspension and fine by the NASD for allegedly maintaining discretionary accounts "with a member firm" without giving his firm notice. Wey never admitted or denied the charges. In his email responses, he told me he was stung by "a technical charge" because he refused to sell a 40 cent stock for a small broker dealer. He never sought to get reinstated. Burstein, his attorney, adds that Wey has had no legal obligation to reacquire any securities licenses or disclose disciplinary actions relating to services he no longer provides.

This much is certain, however: Wey will never likely be reinstated as a broker or investment advisor in Oklahoma. Last year, after several years of legal wrangling, he was censured by the Oklahoma Department of Securities. While not admitting or denying the charges, he agreed he wouldn't ever again seek to do any brokerage or investment advisory business in the state.

According to state records, he recommended stocks to several people without properly disclosing their risks. It was also alleged that he made at least one trade that wasn't authorized and that on several occasions didn't follow his clients' instructions. Furthermore, according to the state's complaint, he didn't tell customers he had a consulting agreement with companies whose stocks he was selling. Burstein says none of the allegations against Wey in Oklahoma were ever proven and that it was "far more cost-effective" for him to accept censure and agree never to do business "in a state to which he never planned to return, especially since he never intended to secure similar licensing anywhere or anytime in the future." New York Global's brokerage arm, however, is licensed in Oklahoma.

Fired as CEO

But there's more: Wey had been founder, majority shareholder and CEO of Benchmark Global Capital in Oklahoma, which like New York Global, specialized in Chinese stocks. When I first asked, through his spokesman, whether he had ever been associated with "Benchmark Capital" -- not Benchmark Global Capital -- and whether he changed his name from Wei to Wey, his email response was, "No."

He moved the company to New York in June 2002 through the purchase of his Oklahoma operations by a New York-based entity of the same name. Within six months he was fired as CEO and as a director by his board. He sued the board to get his jobs back. According to a detailed affidavit by Jerry Gruenbaum, then general counsel of Benchmark, Wei was fired "for cause" because he was believed to be involved in insider [sic] trading and misappropriating Benchmark funds. Burstein says Wey received a preliminary injunction that restored him to the board "and then settled the case on confidential terms that resulted in him receiving substantial monies and assets from Benchmark." Gruenbaum says there was never a settlement and that Wey was never returned to the board.

Meanwhile, back at New York Global: Research reports by the brokerage division of Wey's firm, which until recently covered Bodisen, did not disclose any current or prior business relationship between New York Global and Bodisen. At a recent Roth Capital conference, where Wey gave the presentation for Bodisen, he only identified himself as vice director of the China Mergers and Acquisitions Association and a visiting professor of two Chinese universities. He never mentioned he was president of New York Global. He says he was specifically instructed not to mention New York Global's name during the session "out of concern that Bodisen might be seen to be promoting" New York Global's business.

Not to mention the appearance of a possible conflict. Makes you wonder what else investors might not know.

23.    Bodisen's heavy reliance on and questionable ties to a securities promotion firm whose founder and controlling shareholder was embroiled in controversy was enough to make AMEX question the transparency and extent of the relationship in its delisting letter. At no time in the Company's SEC filings or other public statements did Bodisen disclose the basis for the Company's relationship with NYGG or the extent of NYGG's influence on the Company. In fact, Bodisen's 2005 Forms 10-KSB and 10-KSB/A state "ITEM 12. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS….None." The May 1, 2006 *New York Post* article also indicated that that influence might be greater than appearances would suggest:

Yet why stop there, because Bodisen is just one of three nearly identical - and equally murky - deals that all trace one way or the other to New York Global Group. All three involve companies based in China with stocks that trade in the U.S.

What's more, all three share the same obscure Los Angeles-based auditors. And

all three have share prices that are trading at or near their highs in the frothy stock market for so-called "China plays," boasting a combined market value of close to $580 million.

Finally, all three have shared the same investment relations firm, whose press releases on their behalf pretty much read like copies of each other from the office Xerox machine.

In some cases, it hasn't even been necessary to change the names on the various releases because all three companies share the same type window dressing in the form of a common board member named Patrick McManus, a former mayor of Lynn, Mass.

And McManus isn't the only ex-mayor to have found late-life fulfillment as an outside director in this trio of companies on the far side of the world. There's also a longtime conservative Republican ex-mayor of Hempstead, L.I., James Arthur Garner, who serves as the head of the compensation committee for a New York Global Group creation called China Natural Gas Co.

*   *   *

Yet from regulatory filings at both the Securities and Exchange Commission and the National Association of Securities Dealers comes the answer as to what New York Global's growth is really all about: The aforementioned three companies are all penny stock reverse mergers, put together by the firm as a way to attract investors looking for Chinese companies that trade in the U.S.

24.     On October 9, 2006, the *New York Post* issued a follow-up report on Bodisen and its relationship to Benjamin Wei and on Defendants' recent, unreported, insider stock selling and stated the following:

CASHING IN WEI OUT; CHINESE INSIDERS DUMP STOCK BEFORE PROMOTER AXED

OVER the last year, this column has kept readers up to speed on the mystery-shrouded activities of a self-regarding young fellow named Benjamin Wei and the group of oddball companies he's been squiring around Wall Street as a penny stock promoter.

*   *   *

Two weeks ago, an avalanche of insider selling hit the shares of a Wei arm-piece called Bodisen Biotech, Inc. The selling erupted days before Bodisen announced on Sept. 29 that it was dumping Wei's investment firm, New York Global Group Inc., as its investment adviser.

More importantly, a review of documents on file with the SEC shows that much of the selling originated with individuals in the city of Yangling, China, where Bodisen is headquartered, and that most of the selling flowed straight through Wei's New York Global Group.

* * *

Anyone who wants to kick the tires on this puppy would have to fly all the way to the city of Yangling in central China, where Bodisen's only known offices are said to be located. (It will help to have a translator at the ready, since none of the Bodisen brass speak English.)

The company's filings with the SEC show that Bodisen was formed at the start of 2004 through the merger of a Chinese fertilizer company and a Vancouver penny stock shell.

The SEC filings make no mention of Wei's role in the merger, but documents on file at the London Stock Exchange, where the company is also listed, name him as a key player.

One reason for Bodisen's silence may be Wei's troubled past in the securities industry. He was fired by the company that hired him straight out of college, Wilbanks Securities, after just seven months on the job. Wilbanks claimed he had been running a financial consulting business secretly on the side.

The National Association of Securities Dealers suspended his broker's license and slapped him with a fine, but Wei seemed undeterred and quickly relaunched himself as CEO of his own firm, Benchmark Global Capital. His target market: the booming Chinese investment scene.

* * *

So Wei moved his business to New York and started again. Yet he soon found himself fighting in court with his former partners in Oklahoma, who accused him of siphoning off money from Benchmark's Chinese operations.

So Wei opened up a whole new operation, New York Global Group, and put the bulk of its stock in the name of his wife. Then he changed the spelling of his last name to Wey and continued chasing up promotable opportunities in China without missing a beat.

* * *

He began issuing stock-puffing press releases for Bodisen from his perch at New York Global, using the corporate pseudonym of Bodisen Biotech Investor Care,

listing New York Global's phone number on the releases, as if it belonged to the fanciful I.R. [investor relations] firm.

Wei's role as Bodisen's I.R. man ended in December of last year, though his behind-the-scenes activities as its deal promoter continued: Several Bodisen SEC filings name New York Global in a $300,000 contract to sell unregistered Bodisen stock to investors in London early this year.

It's also unclear when Bodisen finally decided to sever its ties with Wei completely, though it's clear enough what happened in the nine trading days before Bodisen issued a press release making its decision public: an eye-popping 29 separate "Form 144" stock registration statements tumbled into the SEC in basket.

\* \* \*

If the sellers were too poor to afford homes of their own three weeks ago, they certainly aren't now. The filings show that three lucky filers pocketed an average of $2 million each from their fortuitous decisions to jump ship.

The filings also show that the selloff rained gold on Wei as well. All but the first three forms listed New York Global as the selling broker, implying the Wei-run operation reaped commissions on sales of nearly $15 million worth of stock in the company that was about to fire him.

ALTOGETHER, a total of nearly 1.5 million Bodisen shares were registered for sale in the filings. There may be an innocent explanation for the fishy coincidence in which Wei's firm benefited so handsomely, yet a search of SEC records fails to provide it.

\* \* \*

**The Company's Products Were Neither "Organic" Nor "Biotech"**

25.     In the United States, "biotech" and "organic" have specific meanings relating to how products are manufactured or cultivated. Bodisen repeatedly characterized its 60 packaged products in four product categories: (i) organic compound fertilizer; (ii) organic liquid fertilizers; (iii) pesticides and insecticides; and (iv) agricultural raw materials. Defendant Wang emphasized the importance of this when she said, in a November 3, 2005, press release, "Our products target China's 900 million farmers who increasingly prefer environmentally friendly organic fertilizers

12

over chemical fertilizers. Chinese consumers are very conscious of food quality. Many Chinese

only use foods and vegetables that are grown with organic fertilizers." On January 10, 2006, *The*

*Times (London),* reported that "analysts suggested that the market for organic fertilisers - which,

unlike their chemical counterparts, can be absorbed into the soil and broken down - could be

worth as much as $17 billion in China alone."

     26.    On September 29, 2006, *The New York Post* questioned the use of "biotech" and

"organic" to describe Bodisen's products:

> Bodisen isn't biotech
>
> Then there's Bodisen, which has nothing to do with the "biotech" implied by its
> name. Wey said in his email responses to questions that Chinese companies use
> an equivalent of "biotech" for anything associated with living things, including
> agriculture, plants and bacteria. In the case of Bodisen, the "living" relates to the
> "organic" fertilizer. However, Wey has said its products aren't "organic," as
> defined by U.S. and European standards. "In fact," Wey said during a recent
> presentation on behalf of Bodisen, "in much more strict terms, it's in fact defined
> as natural fertilizers. It's produced based on very sophisticated manufacturing
> company proprietary technology and is not a manure product base at all." While it
> claims to have "proprietary" technology, according to its SEC filings, Bodisen
> says it has no patents.
>
> Bodisen also mentions in its SEC filings that its "organic compound fertilizer
> products" have been "qualified" by the International Standards Organization. An
> ISO spokeswoman, however, says Bodisen's use of ISO suggests it's for product
> certification. "It isn't," she says. "It is the quality management system of the
> company" that is certified and that "has nothing to do with the definition of
> 'organic fertilizer.' The company should be told they cannot advertise their
> product this way." Bodisen's outside investor relations representative was unable
> to provide an explanation; she hadn't received an explanation from the company
> by the time of publication.

     27.    Given the purported value of organics in China and the massive potential for an

organic fertilizer market there, Bodisen's mischaracterization and misrepresentation of its

products as "biotech" and "organic" had serious implications for investors and market analysts.

At no time was Bodisen "organic": its own promoter, Benjamin Wei, admitted as much. The

Company's growth prospects and market value depended heavily on the Company's products

worth to Chinese buyers: a worth which in fact was illusory.

### Delisting by AMEX

28.     Bodisen was traded on the AMEX. In addition to expanding to the London market—AIM—Bodisen continued to trade and issue stock in the United States. The assurances that a company trading on AMEX must adhere to listing requirements and SEC regulations give investors confidence to buy a company's stock.

29.     On November 6, 2006, however, Bodisen received a letter from AMEX stating that the AMEX staff had determined that the Company was not in compliance with certain of the AMEX continued listing standards. The Company's press release on November 12, 2006, addressing the letter stated:

> Among other things, Amex believes that the Company made insufficient or inaccurate disclosure in its public filings with regard to its relationship with, and payments to, a consultancy firm and its affiliates both prior to and subsequent to its listing on the Amex. Additionally, in the context of the Company's relationship with the consultancy firm, Amex expressed concern that the Company has internal control issues related to its accounting and financial reporting obligations. Prior to receipt of the letter from Amex, the Company publicly announced that it had terminated its relationship with the consultancy firm.

This related directly to the Company's relationship with NYGG and its control issues discussed in detail herein. But in addition to this, the Company was also suffering from massive misrepresentations regarding its financial and operational condition, its controls and procedures, and its results of operations. As revealed in a *New York Post* article of November 14, 2006:

> One major unresolved question is the actual ownership of Bodisen itself. Publicly traded companies in the U.S. are required by law to provide audited annual financial statements that include the names of all investors holding 10 percent or more of the company's stock.

> In March, Bodisen filed an audited financial statement with the SEC acknowledging that its ownership list was incomplete "do [sic] to an inadvertent oversight," but that it was working to "rectify the problem."

Eight months later, it still has not filed a corrected statement, even though evidence surfaced in the eruption of insider stock sales in Bodisen's shares in September that an individual named Wei Min Zhang was a recent owner of more than 10 percent of the company's shares.

Investigators have not yet established whether such a person even exists, or the legality of more than $40 million worth of recent Bodisen stock sales, most of which flowed through either New York Global or the troubled brokerage, Chicago Investment Group.

In March, Chicago Investment Group was named in a Brooklyn federal indictment as one of 15 New York-area brokerage firms with branch offices that had been infiltrated and taken over by members of the Colombo, Luchese and Bonanno crime families.

30.     The true deficiencies of the Company's operations and financial reporting were discussed in the AMEX notice officially delisting Bodisen on March 22, 2007, which described the basis for delisting as:

The following is the basis for delisting the Company's common stock as determined by the Amex staff and as set forth in the March 22, 2007 notice from the Amex. The Company is required under applicable SEC and Amex provisions to disclose the rules upon which a delisting is sought and the specific continued listing deficiencies upon which the delisting is based….

"A. Bodisen failed to comply with its Securities and Exchange reporting obligations by filing incomplete, misleading and/or inaccurate information in its public filings through the SEC's Electronic Data Gathering Analysis and Retrieval ('EDGAR') system. The Company's actions in this regard raise significant public interest concerns as well as constituting material violations of federal and/or state securities laws. Specifically:

    1.     The Company's SEC filings contained incomplete, misleading and/or inaccurate disclosures regarding the beneficial ownership of its securities by certain officers and directors on several occasions, prior to and subsequent to its listing on the Amex. These officers and directors knew or should have known that certain filings including Forms 3, Forms 10KSB and 10KSB/A for the periods ended December 31, 2004 and 2005 and the Form DEF 14-A filed on December 1, 2006 were incomplete, misleading and/or inaccurate yet failed to update and/or correct the relevant disclosures contained therein in subsequent SEC filings.

    2.     The Company's disclosures in applicable registration statements and periodic financial filings with respect to the net proceeds from the February 3, 2006 Placing Agreement related to its listing on the AIM Market of the London

15

Stock Exchange, and the offering costs and expenses related to its March 15, 2006 private placement were incomplete, inaccurate and/or misleading.

3.      The Company provided incomplete, inaccurate and/or misleading information related to its relationship with, and payments to, a consultancy firm and its affiliates prior to and subsequent to its listing on the Amex in applicable registration statements and periodic financial filings.

Based on the foregoing, Staff has determined that the Company is not in compliance with Sections 132(a), 134, and 1101 of the Company Guide. In addition, due to the public interest concerns, the Company is subject to suspension from dealings on the Exchange pursuant to Sections 127 and 1003(f)(iii) of the Company Guide."

"B. The Company failed to provide public clarification to rumors and/or reports related to the filing of various Forms 144 between August 1, 2006 through December 1, 2006. Specifically, notwithstanding articles in the press concerning the filing of numerous Forms 144, the Company failed to make appropriate public disclosure addressing the concerns related to the transfer or sales of common stock by insiders and apparent inconsistencies with prior public disclosure of controlling stock ownership, as required by Sections 132(a), 401(a), 402(a) and 403 of the Company Guide."

"C. Bodisen failed to provide information and documents reasonably requested by the Staff related to the beneficial ownership of the Company's securities held by certain officers and directors as required by Section 132(e) of the Company Guide. Further, Bodisen has been unable to provide written updates to the Staff as required pursuant to the terms of the acceptance of the Company's plan or written responses to the Staff's information request dated March 16, 2007, as required by Section 132(e) of the Company Guide."

"D. Bodisen has internal control weaknesses related to its accounting and financial reporting obligations which rise to the level of a public interest concern. Based on information received by the Staff, the Company failed to consistently review and reconcile its shareholders ownership records with those of its transfer agent to ensure that its SEC filings and public disclosures were accurate. In this regard, the Company continuously reported in its SEC filings since listing on the Amex that certain officers either directly or indirectly held an aggregate of 40% ownership in the Company's common stock, notwithstanding that its transfer agent records were inconsistent with such reports and disclosures. Further, by failing to reconcile these records, the Company may have inaccurately reported its capitalization. Accordingly pursuant to Sections 127 and 1003(f)(iii) of the Company Guide the Company is subject to suspension from dealings on the Exchange."

"The deficiencies described above evidence that the Company has engaged in a pattern and practice of non-compliance with Amex listing requirement encompassing a broad range of qualitative and corporate governance concerns as well as violations of applicable federal and/or state securities laws, which collectively rise to the level of a public interest concern and subject Bodisen to delisting pursuant to Sections 127 and 1003(f)(iii) of the Company Guide. In this regard, notwithstanding that it is the responsibility of management and the board of directors to ensure that the Company operates in compliance with all applicable laws, rules and regulations, the Company has evidenced that it is unable to (i) effectively monitor its compliance with federal and/or state securities laws, as well as Amex requirements, and (ii) appropriately oversee the actions and activities of its consultants, agents and advisors."

31.    These ongoing deficiencies were concealed by the Company and materially impacted its operations and reporting throughout the Class Period.

### Inadequate Internal Controls

32.    In addition to its relationship with NYGG and Wei, its inappropriate characterization of its products, and its financial reporting which resulted in delisting from AMEX, Bodisen had fundamental and wide-spread deficiencies in internal controls. Defendants made repeated representations in SEC filings, releases, and certifications that it had adequate internal controls and management, rendering it reliable and stable. Bodisen's 3Q:05 10-QSB, filed November 3, 2005, 2005 10-KSB, filed March 28, 2006, 1Q:06 10-QSB, filed May 9, 2006, 2005 10-KSB/A, filed August 2, 2006, 1Q:06 10-QSB/A, filed August 2, 2006 and 2Q:06 10-QSB, filed August 14, 2006 each contained the same reassuring language that "the Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures were effective as of the end of the period covered by this report. There were no changes in internal control over financial reporting…that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting."

33.    But despite the Company's assurances, on March 24, 2007, the Wall Street Journal reported on Bodisen:

The company, which for months has seen investors from China dump millions of shares, said it isn't sure who owns shares that originally were controlled by its current and former CEOs.

Bodisen also says it doesn't know whether the holders of those shares can file claims that would "constitute a material liability or materially impact the capitalization of the company." It's unclear what that gobbledygook means, but it's no wonder the stock's trading in the U.S. remains halted.

### Material Related Party Transactions

34.    Defendants violated GAAP and SEC rules by failing to disclose in the Company's financial statements material related party transactions.  As the AMEX has now determined, before and during the Class Period, Defendants engaged in various material related party and self-dealing transactions that were not disclosed in its financial statements.  In this regard, the Company disclosed in its November 12, 2006 press release that:

> Amex believes that the Company made insufficient or inaccurate disclosure in its public filings with regard to its relationship with, and payments to, a consultancy firm [NYGG] and its affiliates both prior to and subsequent to its listing on the Amex.  Additionally, in the context of the Company's relationship with the consultancy firm, Amex expressed concern that the Company has internal control issues related to its accounting and financial reporting obligations.

### DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS MADE DURING THE CLASS PERIOD

35.    On November 3, 2005, the inception of the Class Period, Bodisen published a release announcing results for the third quarter ended September 30, 2005. In addition to reporting a 94% increase in revenue and an 80% increase in reported net income, this release also stated, in part, the following:

> Bodisen Biotech Announces 3rd Quarter Earnings of $0.22 per Share, 94% Increase in Revenue and 80% Increase in Net Income

***

Bodisen is the first Asia based environmentally friendly bio fertilizer company listed on a US stock exchange. The following are some of the highlights as reflected in its filing with the SEC:

Selected Third Quarter 2005 Results Compared to the Same Period in 2004

*** 

    \*    Basic earnings per share of $0.22 before the financing related accounting charge of $0.03 per share as a result of a $3 million financing the company completed in March 2005 (fully diluted:$0.19 after charge), an increase of 90% for both basic and fully diluted earnings per share.

Selected Results for the First Nine Months of 2005 Compared to the Same Period in 2004

*** 

    \*    Basic earnings per share of $0.42 (fully diluted: $0.41), an increase of 68% for basic earnings per share and 64% for fully diluted

    36.    In addition to the foregoing, the Company's November 3, 2005, release also

quoted Defendants, in part, touting the "organic" nature of the Company's products as follows:

MANAGEMENT COMMENTS

[Defendant] Qiong Wang, CEO of Bodisen commented: "Our third quarter results have exceeded expectations. …Our products target China's 900 million farmers who increasingly prefer environmentally friendly organic fertilizers over chemical fertilizers. Chinese consumers are very conscious of food quality. Many Chinese only use foods and vegetables that are grown with organic fertilizers. In order to increase their household income, farmers across China demand fertilizers that not only generate higher crop yields such as Bodisen's products, but also are organic and environmentally friendly. …

[Defendant] Wang continued: "Bodisen is an environmentally friendly company. The Chinese government has planned a "green" Olympics in 2008 featuring China's focus on environmental issues. Environmental concerns are among China's top priorities. Over the years, chemical fertilizers have been a major source of pollution in China harming the land and water supply. Soil damage from chemical fertilizer use has caused crop yields to dramatically decrease in many regions across China. Market share for environmentally friendly bio fertilizers has been increasing year over year while market share for chemical fertilizers are decreasing. Bodisen's environmentally friendly fertilizers are in a favorable

market environment to support our continued rapid growth. Bodisen's management is committed to increasing investor awareness…

37.    Also on or about November 3, 2005, Defendants filed with the SEC the Company's 3Q:05 Form 10-QSB for the quarter ended September 30, 2005, signed and certified by Defendants Wang and Lai. In addition to making substantially similar statements concerning the Company's results of operations as had been published previously, the 3Q:05 Form 10-QSB also assured investors that Bodisen's financial results were prepared in accordance with GAAP and SEC accounting rules, in part, as follows:

2.    BASIS OF PRESENTATION

The accompanying unaudited financial statements of the Company have been prepared in accordance with generally accepted accounting principles for interim financial information.

38.    The Company's 3Q:05 Form 10-QSB also contained representations which attested to the purported effectiveness and sufficiency of the Company's controls and procedures, as follows:

Item 3. Controls and Procedures

The Company's Chief Executive Officer and Chief Financial Officer conducted an evaluation of the effectiveness of the design and operation of the Company's disclosure controls and procedures as defined in Exchange Act Rule 13a-15(e) as of the end of the period covered by this report. Based on that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures were effective as of the end of the period covered by this report. There were no significant changes in internal controls over financial reporting that occurred during the third quarter of 2005 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

39.    In addition to the foregoing, the Company's 3Q:05 Form 10-QSB also contained certifications by Defendants Qiong Wang and Yiliang Lai, that attested to the purported accuracy and completeness of the Company's financial and operational reports, certifying that:

this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report…the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the small business issuer as of, and for, the periods presented in this report."

The certifications also asserted that the Company had ensured "such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles" and had disclosed "all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the small business issuer's ability to record, process, summarize and report financial information.

40.    A separate certification signed by Wang and Lai and attached as exhibit 32.1 to the 3Q:05 Form 10-QSB asserted that "pursuant to Section 906 of the Sarbanes-Oxley Act of 2002…the Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934" and "the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

41.    These certifications, dated November 2, 2005, were signed by defendant Wang as Chief Executive Officer, and defendant Lai, as Chief Financial Officer.

42.    Substantially similar Certifications were also signed by Defendants Wang and Lai on or about March 28, 2006, May 9, 2006, and August 14, 2006, and filed with the SEC in connection with the reporting of the Company's financial results pursuant to its 2005 Form 10-KSB and its 1Q:06 and 2Q:06 Form(s) 10-QSB.

43.    Following the publication of the November 3, 2005 release and the filing of the Company's 3Q:05 Form 10-QSB, shares of Bodisen traded to artificially inflated levels of at $7.45 per share on November 3, 2005 before closing trading at $7.01 per share. That day, over 172,400 Company shares traded, several times its near-term average trading volume.

21

44.     The statements contained in Bodisen's November 3, 2005, release and those statements contained in the Company's 3Q:05 Form 10-QSB, referenced above, were each materially false and misleading when made, and were known by Defendants to be false or were recklessly disregarded as such thereby, for the following reasons, among others:

- the Company's "organic" products were not actually organic, nor were they "biomass", as the terms are used;

- the Company's financials did not comply with GAAP because of internal control problems and issues concerning beneficial ownership of the Company, such as non-disclosure of the identity of investors owning a  large percentage of stock, and concealment of relationships with and payments to the Company's consultant, NYGG;

- the Company may have inaccurately reported its capitalization; and

- The Company concealed and failed to disclose the true, adverse material facts set forth at ¶¶ 19-34.

45.     On December 6, 2005, Defendants published a release on *Business Wire* announcing that the Company had signed a new contract valued at US $43 million. At the same time, Defendants used the opportunity of the announcement of this contract to continue to condition investors to expect "record earnings for 2006," and a "continued favorable market environment" in the foreseeable near-term. This release also stated, in part, the following:

> Ms. Qiong Wang, CEO of Bodisen commented: "Bodisen is an environmentally friendly company in a favorable market environment. Bodisen has been a public company for almost two years. During this time, our management team has been focused on earnings growth, market share growth and corporate governance. Our shareholders have taken notice of our stellar earnings growth as evidenced in growing number of institutional funds owning our shares. China's agricultural sector provides 900 million farm related jobs out of the country's 1.3 billion in population. With proprietary agricultural technology and less than half a percent of total fertilizer market share, Bodisen faces tremendous growth opportunities.

With sound execution strategies, Bodisen is an access to China's environmental solutions."

46.    Defendants' statements in this release were materially false and misleading, and were known by Defendants to be false or were recklessly disregarded as such thereby, because the Company touted "proprietary agricultural technology" but did not own any patents or have any pending patents.  Indeed, not a single patent is listed in the Company's Class Period SEC filings. Further, the "management team" was not focused on "earnings growth, market share growth, and corporate governance."  To the contrary, Defendants knew or recklessly disregarded their materially deficient internal controls and material failures to comply with GAAP.

47.    Following the publication of this release, shares of the Company traded up almost $3.00 per share, to an artificially inflated high of $13.65 per share from the prior day's close of $10.70 per share. That day, shares closed at $12.68 per share and over 1.186 million shares traded, more than 10 times the Company's near-term average trading volume.

48.    On January 24, 2006, defendants published a release on *Business Wire* that purported to announce that China had eliminated certain agricultural taxes.  Defendants again used the Company's release to condition investors to believe that Bodisen was performing at or beyond plan.  As evidence of this, the Company's release again quoted defendant Wang, in part, as follows:

> China Eliminates 50 Year Old Agricultural Tax, Bodisen Biotech Sees Increased Sales in 2006 and Beyond
>
> Ms. Karen Qiong Wang, Chairman & CEO of Bodisen commented: "…Our sales channels have already seen positive responses and increased orders from our end user farmers. Bodisen is on track to achieve record earnings growth in 2006 and maintains its position as one of the fastest growing companies in China."

49.    This statement was materially false and misleading when made, and was known by Defendants to be false or was recklessly disregarded as such thereby, because "record

earnings" could not be accurately reported as Defendants did not accurately report its market capitalization and its earnings growth was tainted by GAAP violations and material internal control deficiencies.

50.    This release too had the purpose and effect of artificially inflating the price of Company shares. Thus, following the publication of this release, shares of Bodisen again rallied, to just below $19.00 per share, before closing the trading day on January 24, 2006, at $18.65 per share. That day, over 515,000 shares traded, many times the Company's near-term average trading volume. The Company concealed and failed to disclose the true, adverse material facts set forth at ¶¶ 19-34.

51.    As defendants prepared to list the Company's shares on the AIM, Bodisen stock continued to trade higher in the U.S. As evidence of this, by January 27, 2006, shares of the Company traded above $19.50, closing at $19.11, and the following day traded to $21.35, before closing at $21.30 and before reaching a trading high the next day of almost $22.00. Taking full advantage of the artificial inflation in the price of Company shares caused as a result of Defendants' publication of materially false and misleading statements, on February 6, 2006, the Company published a release on Business Wire announcing that Bodisen shares had been listed on the London AIM. This release stated, in part, the following:

> Bodisen Biotech Completes Dual Listing of Shares on the London Stock Exchange AIM, Raised GBP 12 Million (US$21.36 million) in Strategic Financing with UK Institutional Investors, Bodisen Management Rings Opening Bell in London
>
> Bodisen Biotech, Inc., (AMEX:BBC, London AIM:BODI, website: www.bodisen.com), the first China based environmentally friendly bio fertilizer company listed on a US stock exchange, announced the successful completion of financing and dual listing of its US shares on the London Stock Exchange AIM market. Bodisen sold 1,643,836 (slightly over 9% of post offering outstanding shares) at GBP 7.30 (Approximately US$13) per share. No warrants or options

were associated with this offering. Bodisen has a total of 17,764,836 shares outstanding after the transaction….

Bodisen's shares started trading in the AIM market of the London Stock Exchange on the morning of February 6, 2006 with the company's management team ringing the opening bell in London. Global investors are able to buy the same Bodisen common stock listed both on the American Stock Exchange and in London.

*    *    *

According to Charles Stanley, UK institutional investors showed strong interest in Bodisen's offering by oversubscribing for the offering several times. The Company's shares were placed with a limited number of international institutional investors outside the United States. Bodisen is the largest China based company listed on the London Stock Exchange AIM market.

52.    The above statements were materially false and misleading when made, and were known by Defendants to be false or were recklessly disregarded as such thereby, because the Company represented that it had a total of "17,764,836 shares outstanding after the transaction," when in fact the Company did not know and could not even accurately represent the beneficial ownership of large percentages of its shares outstanding, either before or after the transaction. The statements were also materially false and misleading when made, and were known by Defendants to be false or were recklessly disregarded as such thereby, because the Company misleadingly represented that it is the "largest China based company listed on the London Stock Exchange AIM market," as the Company did not know its market capitalization at the time, and the total number of shares outstanding was called into question by Defendants' lack of internal controls and failure to even comprehend or alternatively, its efforts to conceal, the beneficial ownership of large percentages of the Company's shares.

53.    The Company's February 6, 2006 release again quoted defendant Wang, in part, as follows:

Ms. Karen Qiong Wang, chief executive officer of Bodisen commented, "In our news release dated July 19, 2005, Bodisen announced its endeavor to seek dual listing of shares in London. The goal was to raise growth capital, expand our

institutional shareholder base and potentially increase our product distribution to international markets. Since our listing on the American Stock Exchange in August 2005, we have experienced greater liquidity as well as strong institutional interest from global fund managers. In addition, due to our increased visibility, Bodisen has received many requests from US, European and Asian agricultural product companies wishing to potentially become Bodisen's product distributors for their local markets. While Bodisen continues to explore ongoing strategic discussions while experiencing strong sales and earnings growth in our core markets in China, Bodisen must be able to increase manufacturing and supply capabilities to satisfy overwhelming product demand from Chinese farmers. Bodisen branded products stand for high quality and higher crop yields, at similar costs to traditional chemical fertilizers. Bodisen's products will fundamentally change Chinese farmers' fertilizer use behavior from chemical fertilizers to natural fertilizers like ours. We are taking market share away from chemical fertilizer companies, including global industry players who have much longer presence in the Chinese market."

Ms. Wang concluded," Bodisen is dedicated to serving the best interest of our shareholders through solid revenue and earnings growth. During the process of our share placement in London, we were pleased that the entire financing was completed with a limited number of well known large institutional funds with a long-term investment focus. The financing was overwhelmingly received in London with strong institutional demand as evidenced in the total buy order interest. The total number of new shares offered is relatively small while the benefits from increased share liquidity could be significant."

54.     The above statements in the Company's February 6, 2006 release were materially false and misleading when made, and were known by Defendants to be false or were recklessly disregarded as such thereby,  because the "strong institutional demand" touted by defendants was not a result of interest in the Company's products or its prospects.  Rather, while defendants represented that the AIM Offering in the U.K. was over-subscribed because of interest in the Company's business, in truth, by selling shares at an astounding $9.00 below market price, investors could purchase the AIM shares and short sell Bodisen shares on the AMEX for an immediate profit. Multiplied by the full 1.6 million shares offered, defendants effectively transferred $144 million in investors' wealth directly into the hands of defendants' preferred institutional bankers. Under such unusual and improper conditions, it is no wonder why the

Bodisen AIM offering was so overwhelmingly well-received in London. The above statements were also materially false and misleading when made, and were known by Defendants to be false or were recklessly disregarded as such thereby, because, despite the fact that Bodisen's products are not organic or made from biomass (*e.g.*, manure), the Company misleadingly touted its natural products over its competitors' products. In fact, as reported in the *New York Post* on September 29, 2006, "Wey has said its products aren't 'organic,' as defined by U.S. and European standards. 'In fact,' Wey said during a presentation on behalf of Bodisen, 'in much more strict terms, it's in fact defined as natural fertilizers. It's produced based on very sophisticated manufacturing company proprietary technology and is not a manure product base at all.'" *Id.* The statement is also materially misleading, and known by Defendants to be false or recklessly disregarded as such thereby, because it fails to disclose that the Company's "increased visibility" is due in part to the marketing efforts of NYGG, whose relationship and payments received from Bodisen were concealed. The Company concealed and failed to disclose the true, adverse material facts set forth at ¶¶ 19-34.

55.    In addition to the foregoing, in connection with the 1.643 million share PIPE transaction to be listed on the AIM in the U.K. on February 7, 2006, defendants filed with the SEC pursuant to Form 424B1, a Registration Statement and joint Proxy-Prospectus.[1] The Registration Statement was signed by Defendants Wang and Chen. In addition to reiterating many of the same materially false and misleading statements as had been published previously, the Registration Statement stated the following:

---

[1] In addition to Defendant Kabani & Co. which was identified in the Registration Statement as the Company's Auditor, Deloitte & Touche LLP ("Deloitte & Touche") also acted as "Reporting Accountant" to the Company in connection with the AIM PIPE Offering. New York Global Group acted as U.S Corporate Advisor in connection with this offering.

2. Basis of preparation

The accompanying unaudited financial statements of the Company have been prepared in accordance with generally accepted accounting principles for interim financial information.

\*    \*    \*

5. Interests in Share Capital

(a) As at 31 December 2005, being the latest practicable date prior to the publication of this document, the interests of (i) management and (ii) the Directors (and persons connected with them within the meaning of section 346 of the Act) in the share capital of the Company which (a) have been notified to the Company pursuant to sections 324 or 328 of the Act; or (b) are required to be entered in the register maintained pursuant to section 325 of the Act; or (c) are interests of a person connected with a Director (within the meaning of section 346 of the Act) which would, if the connected person were a director of the Company, be required to be disclosed under (a) or (b) above, and the existence of which is known or which could with reasonable diligence be ascertained by that Director, were, and, on the assumptions referred to below, immediately following the Admission are expected to be, as set out below (all interests specified are beneficial unless otherwise stated):

|  | As of 31 December 2005 | | Number of shares of Common Stock immediately following Admission | |
| --- | --- | --- | --- | --- |
| *Name* | *Number of shares of Common Stock* | *% of issued Share Capital [1]* | *Number of shares of Common Stock* | *% of issued Share Capital* |
| Qiong Wang | 3,748,780 | 23.25% | 3,748,780 | 21% |
| Bo Chen | 3,584,096 | 22.73% | 3,584,096 | 20% |
| David Gatton | 64,875[2] | 0% | 64,875[2] | 0% |
| Patrick McManus | 64,875[2] | 0% | 64,875[2] | 0% |
| Weirui Wan | None | None | None | None |

McManus and Gatton reflect options vested but not exercised. Percentage is less than 1%

(1)    Based on 16,120,902 shares of Common Stock currently outstanding.

(2)    Reflects stock options vested but unexercised.

56.    The foregoing statements contained in the Registration Statement and Prospectus

were materially false and misleading when made, and were known by Defendants to be false or

were recklessly disregarded as such thereby, because Defendants could not identify all beneficial owners of more than 10% of the stock as required by the SEC and GAAP Rules, and which formed part of the basis for the Company's delisting from the AMEX. In fact, there was no evidence that certain purported beneficial orders were real persons rather than fictitious identities invented by Defendants to conceal the identities of the true beneficial owners

57.    In addition to the foregoing, the February 7, 2006, Registration Statement also contained a purported Report of Independent Registered Public Accounting Firm, Kabani & Co., that reported the following:

FINANCIAL STATEMENTS DECEMBER 31, 2004 AND 2003

Report of independent registered public accounting firm

To the Board of Directors and Stockholders

Bodisen Biotech, Inc.

We have audited the accompanying consolidated balance sheet of Bodisen Biotech, Inc. (a Delaware corporation) and subsidiaries as of December 31, 2004 and the related consolidated statements of income, stockholders' equity, and cash flows for the years ended December 31, 2004 and 2003.…

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Bodisen Biotech, Inc. and subsidiaries as of December 31, 2004, and the results of its consolidated operations and its cash flows for the years ended December 31, 2004 and 2003 in conformity with accounting principles generally accepted in the United States of America.

/S/ KABANI & COMPANY, INC.
CERTIFIED PUBLIC ACCOUNTANTS
Huntington Beach, California
March 1, 2005

*    *    *

BODISEN INTERNATIONAL INC.
AND SUBSIDIARY
FINANCIAL STATEMENTS DECEMBER 31, 2003 AND 2002

Independent auditors' reports

Board of Directors and Shareholders
Bodisen International, Inc.,

We have audited the accompanying consolidated balance sheets of Bodisen International Inc, and subsidiary as of December 31, 2003 and 2002, and the related consolidated statements of income, shareholders' equity, and cash flows for the years ended December 31, 2003 and 2002.…

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Bodisen International Inc, and subsidiary as of December 31, 2003 and 2002, and the consolidated results of their operations and cash flows for the years ended December 31, 2003 and 2002 in conformity with accounting principles generally accepted in the United States of America.

/s/ Kabani & Company, Inc.

Kabani & Company, Inc.
CERTIFIED PUBLIC ACCOUNTANTS
Fountain Valley, California
February 5, 2004

58.    The above statements in the Company's Form 424B1 were materially false and misleading when made, and were known by Defendants to be false or were recklessly disregarded as such thereby, because the Company's financials did not comply with GAAP because of internal control problems and issues concerning beneficial ownership of the Company, such as non-disclosure of the identity of investors owning a large percentage of stock, and concealment of relationships with and payments to the Company's consultant, NYGG. The Company also concealed and failed to disclose the true, adverse material facts set forth at ¶¶ 19-34.

59.    Taking full advantage in the artificial inflation in the price of Company shares caused as a result of the publication of Defendants' materially false and misleading statements, on March 20, 2006, the Company completed the sale of over 5.32 million restricted shares of Bodisen common stock priced at $14.00 per share to institutional investors in a private

placement, to raise additional gross proceeds of over $74.48 million. At the time Defendants

announced this private offering, they also stated that Bodisen anticipated "accelerated earnings

growth in 2006." At that time, Defendants also stated that the Company had a "strong balance

sheet with approximately $26 million in cash. This release also stated the following:

> Karen Qiong Wang, Chief Executive Officer of Bodisen commented, "Bodisen is
> focused on strengthening its balance sheet in anticipation of accelerated earnings
> growth in 2006 and beyond. With approximately $26 million in cash and our
> current growth plan in place, we do not anticipate the need to raise any additional
> capital. Bodisen is the largest organic fertilizer company in China with an
> extensive nationwide distribution network. Our plans include having two new
> production facilities fully operational before next year's planting season, which
> could potentially enable us to double our revenues in 2007 compared to 2006,
> while targeting on average net profit margin of approximately 30% of sales."
>
> Commenting on China's chemical fertilizer industry, Ms. Wang continued: "With
> farmers continuing to shift from the use of chemical fertilizers to environmentally
> friendly bio-active fertilizers, such as Bodisen's - which increase farmers' crop
> yields by as much as 35% while restoring soil nutrients at the same cost as
> chemical fertilizers - we continue to see favorable market conditions that we
> believe will further accelerate our earnings growth potential in 2006 and beyond."
>
> London investment bank Charles Stanley and the China subsidiary of Wall Street
> firm New York Global Group acted as advisors to Bodisen related to the above
> mentioned financing. Global law firms Jones Day and Sichenzia Ross Friedman
> Ference acted as legal counsels to this transaction.

60.     Defendants' statements in this release were materially false and misleading when

made, and were known by Defendants to be false or were recklessly disregarded as such thereby,

because Bodisen was not "the largest *organic* fertilizer company in China with an extensive

nationwide distribution network."  Rather, its products were not organic at all.  On the contrary,

the so-called "organic" fertilizers were *natural* fertilizers, produced by manufacturing company

proprietary technology, and not a manure-based product at all.  In addition, these statements

were materially false and misleading when made, and were known by Defendants to be false or

were recklessly disregarded as such thereby, because while the Company did note that NYGG

"acted as [an] advisor[] to Bodisen related to the above mentioned financing," it omitted to disclose the material fact that the Company had close ties to its "consultant" NYGG and Benjamin Wei. The exact nature of that relationship was never disclosed, nor was the amount and purpose of payments to NYGG.

61.    Defendants' materially false and misleading statements again acted to artificially inflate the price of Company shares and, on March 20, 2006, following the publication of Defendants' aforementioned release, shares of Bodisen traded to $18.00 per share before closing the trading day at $17.99 per share. That day, over 653,000 shares of Bodisen stock traded on the AMEX, several times the Company's near-term average daily trading volume.

62.    On March 28, 2006, Bodisen published a release announcing results for the fourth quarter and year ended December 31, 2005. In addition to reporting a purported 91% increase in revenue and 75% increase in reported net income, this release also stated the following:

> Bodisen Biotech Reports Record Earnings Per Share of $0.56 in 2005, Net Income Up 75%, Revenues Up 91%
>
> Excluding One-Time Financing Related Accounting Charges, Bodisen Well Positioned for Substantial Earnings Growth in 2006
>
> ***
>
> 2005 FINANCIAL HIGHLIGHTS
>
> Karen Qiong Wang, Chief Executive Officer of Bodisen commented, "We're *very pleased with Bodisen's continued substantial growth in 2005*. Our results for the year reflect the growing demand for environmentally friendly, high quality, high yield organic fertilizer solutions and the increased strength of the Bodisen brand among China's farmers."
>
> REVENUES
> Bodisen achieved record revenues of $30,975,350 for the year ended December 31, 2005, up 91% from the prior year when the company reported revenues of $16,225,896. The growth in revenue was primarily attributable to the company's completion of a larger manufacturing facility in March 2005 and the success of its

marketing efforts, which resulted in Bodisen increasing the number of new contracts and retaining existing customers.

2005 OPERATIONAL HIGHLIGHTS

* Finished construction of new manufacturing facility at the company's current location, doubling its organic fertilizer production capacity.

* Received research coverage from New York Global Securities.

* Began trading on the American Stock Exchange.

63.    The above statements in the Company's March 28, 2006 press release were materially false and misleading when made, and were known by Defendants to be false or were recklessly disregarded as such thereby, because, as discussed above in ¶¶19-34, the products were not organic and the Company failed to disclose its full relationship with NYGG.

64.    In addition to the foregoing, the Company's March 28, 2006 release also quoted Defendants as follows:

MANAGEMENT DISCUSSION AND 2006 OUTLOOK

"Demand for organic fertilizers and pesticides continue to grow at a high rate," said Ms. Wang. "Bodisen's more than 60 products provide farmers throughout China with a viable, economically attractive solution that are competitively priced compared to traditional chemical fertilizer products. At the same time, our products require less time to apply, create up to 35% higher crop yields, improve soil conditions and increase potential revenues for farmers who can sell their products as 'certified organic green foods,' which typically achieve retail prices of 50-200% higher than products that are not considered 'certified organic green foods.'"

*    *    *

65.    The above statements in the March 28, 2006 Press Release were materially false and misleading when made, and were known by Defendants to be false or were recklessly disregarded as such thereby, because the products were not organic, as discussed above in ¶¶19-34.

33

66.     On or about March 28, 2006, Defendants filed with the SEC the Company's 2005 Form 10-KSB for the year ended December 31, 2005, signed by Defendants Wang, Lai, and Chen, among others, and certified by Defendants Lai and Wang. In addition to making statements that were substantially similar to those statements concerning the Company operations and finances that were contained in the Company's March 28, 2006, release, the 2005 Form 10-KSB also stated the following:

Basis of Presentation

The accompanying consolidated financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America.

\*       \*       \*

Significant Accounting Policies

\*\*\*

Intangible assets

Intangible assets consist of rights to use land and proprietary technology rights to fertilizers. The Company evaluates intangible assets for impairment, at least on an annual basis and whenever events or changes in circumstances indicate that the carrying value may not be recoverable from its estimated future cash flows. Recoverability of intangible assets, other long-lived assets and, goodwill is measured by comparing their net book value to the related projected undiscounted cash flows from these assets, considering a number of factors including past operating results, budgets, economic projections, market trends and product development cycles. If the net book value of the asset exceeds the related undiscounted cash flows, the asset is considered impaired, and a second test is performed to measure the amount of impairment loss. Potential impairment of goodwill after July 1, 2002 is being evaluated in accordance with SFAS No. 142. The SFAS No. 142 is applicable to the financial statements of the Group beginning July 1, 2002.

67.     The above statements contained in the Company's Form 10-KSB were materially false and misleading when made, and were known by Defendants to be false or were recklessly disregarded as such thereby, because the financial statements were not prepared in conformity with GAAP. The above statements are also materially false and misleading when made, and

were known by Defendants to be false or were recklessly disregarded as such thereby, because the Company purports to have "proprietary technology rights" but did not possess even a single patent or have any patents pending during the Class Period. The Company concealed and failed to disclose the true, adverse material facts set forth at ¶¶ 19-34.

68.    The Company's 2005 Form 10-KSB also contained representations that attested to the purported effectiveness and sufficiency of the Company's controls and procedures, as follows:

ITEM 8A. CONTROLS AND PROCEDURES

The Chief Executive Officer and Chief Financial Officer conducted an evaluation of the effectiveness of the design and operation of the Company's disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934, as amended (the Exchange Act)) as of the end of the period covered by this report. Based on that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures were effective as of the end of the period covered by this report. There were no significant changes in internal control over financial reporting (as defined in Rule 13a-15f under the Exchange Act) that occurred during the fourth quarter of 2004 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

69.    In addition, the 2005 Form 10-KSB contained representations that the Company had no relationships and related transactions, as follows:

ITEM 12. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

None.

70.    The above statement was materially false and misleading when made and was known by Defendants to be false or was recklessly disregarded as such thereby because it failed to disclose the secret relationship with Wey and NYGG as discussed at ¶¶ 19-24 above.

71.    The 2005 Form 10-KSB also contained a "Report of Independent Registered Public Accounting Firm," prepared by the Company's independent auditors, Kabani & Company, Inc. This Report stated, in part, the following:

> Board of Directors and Stockholders of
> Bodisen Biotech, Inc.
>
> We have audited the accompanying consolidated balance sheet of Bodisen Biotech, Inc. (a Delaware corporation) and subsidiaries as of December 31, 2005…
>
> We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). …We believe that our audits provide a reasonable basis for our opinion.
>
> In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Bodisen Biotech, Inc. and Subsidiaries as of December 31, 2005, and the consolidated results of their operations and their consolidated cash flows for the years ended December 31, 2005 and 2004, in conformity with U.S. generally accepted accounting principles.
>
> /s/ KABANI & COMPANY, INC.
> Certified Public Accountants
> Los Angeles, California
> February 22, 2006

72.    The above statements by Kabani & Company contained in the 2005 Form 10-KSB were materially false and misleading when made, and were known by Defendants to be false or were recklessly disregarded as such thereby, because, as discussed above in ¶19-34, the Company's financials did not comply with GAAP because of internal control problems and issues concerning beneficial ownership of the Company, such as non-disclosure of the identity of investors owning a large percentage of stock, concealment of relationships with and payments to the Company's consultant, NYGG.

73.    On April 3, 2006, Bodisen published a release stating that Defendants expected to report "Record 1st Quarter Net Income," and "Accelerated Sales and Earnings Growth in 2006." This release also stated the following:

> NEW YORK--(BUSINESS WIRE)--April 3, 2006--Bodisen Biotech, Inc., (AMEX:BBC, London AIM:BODI, website: http://www.bodisen.com/), the first China based environmentally friendly bio fertilizer company listed on a US stock exchange, and dually listed in London, announced today that the company experienced strong sales in the first quarter of 2006. Bodisen sees record earnings for the quarter ended March 31, 2006.
>
> In the first quarter that ended on March 31, 2005, Bodisen reported total revenues of $4,701,675 and net income of $796,733, or $0.05 fully diluted earnings per share.
>
> On the First Quarter Earnings
>
> Karen Qiong Wang, CEO of Bodisen commented: "In 2005, Bodisen reported a year of record sales and earnings. The 4th quarter of each year is historically the slowest period for the agricultural industry due to the frozen winter season and less farming activities. Our earnings in 2005 would have been approximately $570,000 ($0.04 per share) higher, had we not spent critically important marketing expenses in the 4th quarter of 2005 for 2006 related marketing efforts in anticipation of strong growth in 2006.…"
>
> *    *    *
>
> "After completing extensive due diligence on our business and financials led by global law firms Jones Day, ReedSmith and accounting firm Deloitte & Touche, we completed our dual listing in London during the first quarter. The successful dual listing not only provided Bodisen with growth capital and greater name exposure but also opened up new potential product distribution channels for the company as Bodisen receives more and more product requests from European and other international markets. Today, Bodisen is a strong company with a focused management team and no plans to dilute existing shares. The company has a strong and successful operations model capable of sustaining our rapid growth in 2006, 2007 and beyond." said Ms. Wang.

74.    Defendants' statements in this release were materially false and misleading when made, and were known by Defendants to be false or were recklessly disregarded as such thereby, because it was not true that Jones Day, ReedSmith and Deloitte & Touche "complet[ed]

extensive due diligence on [Bodisen's] business and financials." On the contrary, even the most basic adequate due diligence would have uncovered the true concealed facts that Bodisen has extensive internal control weaknesses, failed to comply with GAAP, and concealed the true, adverse material facts set forth at ¶¶19-34.

75.    Following the publication of this release, shares of the Company continued to trade at artificially inflated prices as high as $17.59, before closing that trading day at $16.42 per share. On April 3, 2006, over 441,000 shares traded, many times the Company's near-term average trading volume.

76.    On May 1, 2006, shares of the Company fell to $8.80 per share, from a prior day's close of $14.75 per share, before closing the trading day at $9.37. That day over 3.217 million shares traded after the *New York Post* printed a report that was critical of the Company and raised questions about Bodisen's "murky" relationship with New York Global Group and its owner, Benjamin Wei, as discussed above in ¶¶ 19-24. Following the report by the *New York Post* and as the price of Company shares declined, Defendants took immediate steps to condition investors to continue to believe that the statements in the Post's report were not accurate, that they reflected erroneous information, and that Bodisen was continuing to operate according to guidance sponsored or endorsed by Defendants. Accordingly, on May 3, 2006, Defendants published a release on *Business Wire* which seemed to quiet the discomfiture of the investing public. These statements served their intended purpose, and following their publication shares of the Company immediately traded back to just under $13.00 per share. Moreover, following the publication of purported "record"-setting results for 1Q:06, reported on May 9, 2006, shares of the Company traded to a high of over $15.00 per share before closing the following trading day at $14.64 per share.

77.    On May 9, 2006, Bodisen published a release announcing results for the first quarter ended March 31, 2006. In addition to reporting a purported 124% increase in revenue, a purported 200% increase in reported net income, and a huge increase in reported earnings per share, this release also stated, in part, the following:

Bodisen Biotech Reports Record First Quarter Earnings

Year-Over-Year Revenue Growth of 124%, Net Income Up 200%

NEW YORK--(BUSINESS WIRE)--May 9, 2006--Bodisen Biotech, Inc., (AMEX:BBC, London AIM:BODI, website: http://www.bodisen.com/) the first China based environmentally friendly bio fertilizer company listed on a US stock exchange, and dually listed in London, today announced that it achieved record year-over-year revenue and earnings growth from the production and sale of its organic fertilizer and pesticide products for the first quarter ended March 31, 2006.

FIRST QUARTER 2006 FINANCIAL HIGHLIGHTS

* * *

REVENUES
Bodisen achieved record year-over-year revenues of $10,535,360 for the quarter ended March 31, 2006, up 124% from the same period last year when the company reported revenues of $4,701,675. Growth in revenue was due to the continued high demand for the company's environmentally friendly bio compound fertilizer and liquid fertilizer products.

78.    In addition to the foregoing, the Company's May 9, 2006 release also quoted Defendant Chen, in part, as follows:

"Bodisen is in the process of evaluating several potential opportunities located in China's vast northwest and northeast farm regions. Bodisen's plan to build or acquire existing facilities serving these regions is well on track. We expect these new markets as well as our growing network of new distribution centers to significantly contribute to our growth in 2007 and beyond. Bodisen has a highly capable management team that is dedicated to meeting our 2007 growth targets and executing our current growth plan without diluting our shares."

79.    The above statements contained in the Company's May 9, 2006 release were materially false and misleading when made, and were known by Defendants to be false or were

recklessly disregarded as such thereby, because the Company's "organic" products were not actually organic, nor were they "biomass," as the terms are used. The Company did not have a "highly capable management team", but rather had a covert relationship with the tainted Wei and NYGG that they secretly depended on to a great extent. In addition, the Company concealed and failed to disclose the true, adverse material facts set forth at ¶¶ 19-34.

80.    On or about May 9, 2006, Defendants filed with the SEC the Company's 1Q:06 Form 10-QSB for the quarter ended March 31, 2006, signed and certified by Defendants Qiong Wang and Yiliang Lai. In addition to reiterating the same materially false and misleading financial information as was previously published in the Company's May 9, 2006 release, the 1Q:06 Form 10-QSB also contained statements that attested to the Company's purported "GAAP" compliance, "Revenue Recognition," and "Controls and Procedures" as published by Defendants previously in the Company's prior SEC filings.

81.    On August 11, 2006, Defendants also filed with the SEC, pursuant to Form 424B3, a Registration Statement and joint Proxy-Prospectus in connection with the registration of 513,512 shares held by certain individuals and institutional investors defined therein as the Selling Shareholders. This Registration Statement which was signed by Wang, Chen, and Yiliang Lai, also stated, in part, the following:

SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

The following table sets forth certain information, as of March 29, 2006 with respect to the beneficial ownership of the outstanding common stock by (i) any holder of more than five (5%) percent; (ii) each of our named executive officers and directors; and (iii) our directors and executive officers as a group. Except as otherwise indicated, each of the stockholders listed below has sole voting and investment power over the shares beneficially owned.

| Name of Beneficial Owner (1) | Number of Shares Beneficially | Percentage of Shares Beneficially |
| --- | --- | --- |

|  | Owned | Owned (2) |
|---|---|---|
| Wang Qiong (3) | 3,748,780 | 20.6% |
| Bo Chen (4) | 3,584,096 | 19.7% |
| Patrick McManus | 68,000 | * |
| David Gatton | 68,000 | * |
| Weirui Wan | 0 | * |
| Wang Chunsheng | 0 | * |
| Yiliang Lai. | 0 | * |
| All officers and directors as a group (7 persons) | 7,462,626 | 40.8% |

* Less than 1%.

(1) Except as otherwise indicated, the address of each beneficial owner is c/o Bodisen Biotech, Inc., North Part of Xinquia Road, Yang Ling AG, High-Tech Industries Demonstration Zone, Yang Ling, China 712100.

(2) Applicable percentage ownership is based on 18,176,917 shares of common stock outstanding as of July 31, 2006, together with securities exercisable or convertible into shares of common stock within 60 days of July 31, 2006 for each stockholder. Beneficial ownership is determined in accordance with the rules of the Securities and Exchange Commission and generally includes voting or investment power with respect to securities. Shares of common stock that are currently exercisable or exercisable within 60 days of July 31, 2006 are deemed to be beneficially owned by the person holding such securities for the purpose of computing the percentage of ownership of such person, but are not treated as outstanding for the purpose of computing the percentage ownership of any other person.

(3)    Of the shares beneficially owned by Wang Qiong, 3,028,780 are owned by a dependent daughter.

(4)    Of the shares beneficially owned by Bo Chen, 2,894,096 are owned by a dependent son.

82.    The foregoing statements contained in the Company's August 2006 Registration Statement and Joint Proxy Prospectus were materially false and misleading when made, and were known by Defendants to be false or were recklessly disregarded as such thereby, because Defendants either did not know or actively concealed through the fabrication of fake identities, the true identities of those with 10% or greater beneficial ownership in the Company.

83.    The August 11, 2006, Form 424B3 also contained a purported Report of Independent Registered Public Accounting Firm, Kabani & Co., that reported the following:

*Report of Independent Registered Public Accounting Firm*

Board of Directors and Stockholders of
Bodisen Biotech, Inc.

We have audited the accompanying consolidated balance sheet of Bodisen Biotech, Inc. (a Delaware corporation) and subsidiaries as of December 31, 2005, and the related consolidated statements of income and other comprehensive

income, stockholders' equity, and cash flows for the years ended December 31, 2005 and 2004 and the financial statement schedule for the years ended December 31, 2005 and 2004. … We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Bodisen Biotech, Inc. and Subsidiaries as of December 31, 2005, and the consolidated results of their operations and their consolidated cash flows for the years ended December 31, 2005 and 2004, in conformity with U.S. generally accepted accounting principles. In addition, in our opinion, the financial statement schedule listed in the accompanying index presents fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements.

/s/ KABANI & COMPANY, INC.
Certified Public Accountants
Los Angeles, California
February 22, 2006, except the financial statement schedule listed in the accompanying index, for which the date is June 6, 2006.

84.    The foregoing statements by Kabani and contained in the Form 424B3 were materially false and misleading when made, and were known by Defendants to be false or were recklessly disregarded as such thereby, because the Company's financials did not comply with GAAP because of internal control problems and issues concerning beneficial ownership of the Company, such as non-disclosure of the identity of investors owning a large percentage of stock, concealment of relationships with and payments to the Company's consultant, NYGG. The Company concealed and failed to disclose the true, adverse material facts set forth at ¶¶ 19-34.

85.    On August 14, 2006, Defendants published a release announcing "record"-setting results for the second quarter of 2006, the period ended June 30, 2006. In addition to reporting a purported increase in net income of 118%, a purported increase in revenues of 95%, and substantial gains in earnings per share, this release also stated, in part, the following:

Bodisen Biotech Reports Record Second Quarter Financial Results

Company Reports Earnings per Fully Diluted Share of $0.32 and Net Income of $5.9 Million, up 118% Year-Over-Year, Revenues Grew 95% Year-Over-Year to $16.4 Million

Second Half of 2006 and 2007 Growth Outlook Positive With Strong Product Demand and Company's Expansion Into New Markets

NEW YORK, NY--(MARKET WIRE)--Aug 14, 2006 -- Bodisen Biotech, Inc. (AMEX:BBC - News) (AIM: BODI) (website: http://www.bodisen.com/) the first China-based environmentally friendly bio fertilizer company listed on a US stock exchange, and dually listed in London, today announced that it achieved record revenue and earnings growth from the production and sale of organic fertilizer and pesticide products during the second quarter ended June 30, 2006.

86.     In addition to the foregoing, this release also quoted Defendants, in part, as

follows:

[Defendant] Bo Chen, President of Bodisen, commented: "We experienced another record quarter of revenues and earnings growth during the second quarter of 2006. Our results for the second quarter and for the first half of 2006 reflect strong demand for our environmentally friendly, high yield organic fertilizer solutions and the growing awareness of the Bodisen brand among China's farmers. Our earnings per share of $0.32 again exceeded analyst estimates of $0.25 for the quarter. Our third quarter has historically been the strongest quarter and we look forward to a great year of record growth in 2006."

*   *   *

POSITIVE OUTLOOK

[Defendant] Bo Chen, Bodisen's President, commented: "The market opportunity in China for environmentally friendly fertilizer products remains largely untapped and Bodisen is well-positioned to benefit from China's rising standards of living and end user consumers' demand for natural and organically grown foods and produce. With solid visibility, we are on track to reach our projections for 2006 and 2007. As Chinese farmers continue to shift from chemical fertilizers to our environmentally friendly, higher crop yield bio compound fertilizers, Bodisen will continue to reap the benefits as a leading premium organic fertilizer brand throughout China."

87.     The above statements contained in the August 14, 2006 press release were

materially false and misleading when made, and were known by Defendants to be false or were

recklessly disregarded as such thereby, because the Company's "organic" products were not

88.     On or about August 14, 2006, Defendants filed with the SEC the Company's 2Q:06 Form 10-QSB for the quarter ended June 30, 2006, signed and certified by Defendants Karen Qiong Wang and Yiliang Lai. In addition to reiterating the same materially false and misleading financial information as was previously published in Bodisen's August 14, 2006 release, the 2Q:06 Form 10-QSB also contained statements that attested to the Company's purported "GAAP" compliance, "Revenue Recognition," and "Controls and Procedures," as published by Defendants previously in Bodisen's prior SEC filings.

89.     On September 29, 2006 the New York Post published an article (*see* ¶ 22) questioning Bodisen's involvement with NYGG and Wei further disquieted investors. That day over 1.239 million shares traded as Bodisen shares receded to below $9.00 per share.

90.     On October 9, 2006, shares of the Company again traded below $9.00 per share after the *New York Post* issued a follow-up report (*see* ¶ 24) on Bodisen and its relationship to Benjamin Wei and on Defendants' recent, unreported, insider stock selling.

91.     While the October 9, 2006 *New York Post* report caused shares of the Company to trade below $9.00 per share, Defendants again pushed shares of Bodisen to almost $11.00 after the Company published a release that continued to provide purported favorable near-term guidance. That day, Defendants published a release that stated, in part, the following:

> Bodisen Biotech Expects Strong Revenues and Net Income Growth for Third Quarter Ended September 30, 2006
>
> NEW YORK, Oct. 18, 2006 (PRIMEZONE) -- Bodisen Biotech, Inc.

(AMEX:BBC) (LSE:BODI) (website: www.bodisen.com), the first China-based environmentally friendly bio-fertilizer company listed on a U.S. stock exchange, and dually listed in London, today announced that the company expects to report strong year-over-year revenue and net income growth for the quarter ended September 30, 2006. The company expects to report its third quarter financial results by November 15, 2006.

*** 

For the third quarter ended September 30, 2005, the company recorded $10.5 million in revenues and net income of $2.9 million, or $0.19 fully diluted EPS.

92.    The October 18, 2006 press release was materially false and misleading when made, and was known by Defendants to be false or were recklessly disregarded as such thereby, because the Company failed to disclose the issues raised in the *Post* article as material true facts about the Company. The Company concealed and failed to disclose the true, adverse material facts set forth at ¶¶ 19-34.

## THE TRUE FACTS EMERGE

93.    On Sunday, November 12, 2006, Defendants shocked investors when they published a release that revealed that the Company had received a letter from the American Stock Exchange (*see* ¶ 29) that accused Bodisen of non-compliance with U.S. Exchange rules, and accused Defendants of making materially false and misleading statements to investors. This was the first time it was disclosed to investors that Bodisen's financial results were unreliable.

94.    The following day, Monday November 13, 2006, Defendants filed with the SEC pursuant to Form 8-K, a statement that AMEX had sent Bodisen a delisting letter and that Bodisen intended to file a plan detailing what actions it had taken and would take to bring the Company into compliance with the AMEX Continued Listing Standards. That compliance never took place.

45

95.     The revelations that the Company had materially misrepresented its financial and operational condition, its controls and procedures, and its results of operations, belatedly revealed on November 12 and 13, 2006, caused shares of Bodisen stock to fall precipitously: On November 13, 2006, shares of the Company collapsed over 20% in the single trading day on very high trading volume.

96.     The next day, November 14, 2006, Herb Greenberg at *Marketwatch* reported on Bodisen, stating the following:

Bodisen shows how to hype a stock

SAN DIEGO (MarketWatch) -- How do you get a stock to rise 20% in a single day? Simple: If you're Chinese fertilizer manufacturer Bodisen Biotech, you issue a news release that says in several weeks you expect to report "strong year-over-year" revenue and net income for the quarter just ended, but offer no further details.

That's what Bodisen (BBC) did Wednesday as its shares bounced at new multi-month lows of around $8.50 following a stack of insider sales and several critical commentaries in the press, including a not-so-glowing mention here several weeks ago. That's a far cry from the stock's intra-day trading high of $19.85 in early February. It has since been on a choppy ride downward even though sales and earnings, on the surface, have been growing

                    *    *    *

Enter the glowing earnings-outlook: Aside from hyperbole, however, the only numbers uttered by the company in the release were revenue and net income for last year's third quarter.

Bodisen, you may recall, was mentioned in a column here about Benjamin Wey, president of New York Global Group, who changed his name from Benjamin Wei -- and who pitches himself as a "China expert." See earlier column here.

As Benjamin Wei, he ran afoul of securities regulators on several occasions and was eventually censured from ever again being an investment advisor in the state of Oklahoma.

Subsequently, Wey (as opposed to Wei) became a key voice of Bodisen in the United States, often acting as the company's translator and doing presentations at investor conferences.) After my story ran, pointing out these issues, Bodisen

issued a news release saying it had "terminated" its relationship with Wey's firm. It offered no explanation.

It then issued a letter (but not a news release) to its investors rebutting my column. However, it never answered what I considered to be one of the most puzzling of all questions: Why would an 8.6% investment in China Natural Gas by Bodisen produce a "substantial cost savings" from a customer of China Natural Gas? Bodisen would only say the relationship doesn't provide direct cost savings but instead "indirectly reduces our material cost" through a discount from the customer. Why would an investment in one company "indirectly" create a discount from another? The company declined to elaborate.

97.     In addition to the foregoing, the same day, November 14, 2006, Defendants reported results for 3Q:06, the period ended September 30, 2006. At the time these results were published, investors were quick to notice that Bodisen's "free cash flow," an important performance metric used by investors to evaluate the financial health and performance of the Company, had turned negative.[2] According to reports, for the twelve months ended September 30, 2006, Bodisen reported negative free cash flow of ($9,431,025) compared to positive free cash flow of $597,686 for the comparable year earlier period. Moreover, free cash flow for the most recent twelve months also reached a two-year low. For 3Q:06, Bodisen reported free cash flow of ($1,434,738), compared with $2,476,150 reported the prior year, also representing a two-year low.

98.     Following the publication of these reports, on November 14, 2006, shares of the Company declined an additional 20%, to fall below $4.00 on very heavy trading volume of almost 4 million shares traded.

---

[2] Free Cash Flow is defined as cash flow from operations or operating cash flow plus or minus capital expenditures. "Capital Expenditures" is a line item, found in the Cash Flow From Investments section of a company's Cash Flow Statement, filed quarterly with the SEC.

99.     On January 5, 2007, Defendant Wang announced that she would not stand for reelection to serve as Chairman, CEO, and President of the Company, stating that her decision was based on personal and health considerations.

100.    On February 5, 2007, shares of the Company continued to trade lower after *Business Daily Update* published a report on Bodisen entitled *Tough Sell* that raised questions as to whether Defendant Wang misrepresented her reasons for retirement and used this as a means of liquidating her personally-held shares while in possession of material false and misleading information about Bodisen. As evidence of this, the *Business Daily Update* report stated that, "[d]uring the chaos, the board chairwoman Wang attempted to resign for 'health reasons.' But a source close to the Company says that the resignation might enable Wang to turn her shares in the company into millions of renminbi."

101.    On March 19, 2007, shares of the Company were finally suspended from trading on the AMEX, and halted at $3.36 per share. The suspension came as a result of Bodisen's failure to come into compliance with the listing requirements for AMEX. The same day, Defendants published a release stating that the Company then anticipated receipt of a Notice of Delisting from the AMEX and that Defendants would delay the filing of the Company's Annual Report on Form 10-KSB:

> Bodisen Biotech Anticipates Notice of Delisting from the Amex, Announces That It Will Delay the Filing of its Annual Report on Form 10-K and Provides Updated Information Regarding Stock Ownership
>
> SHAANXI, China, March 20, 2007 (PRIME NEWSWIRE) -- Bodisen Biotech, Inc. (the "Company") (AMEX:BBC), (London:BODI), (website: www.bodisen.com) today is providing information regarding the Company's anticipated delisting from the American Stock Exchange (the "Amex"), the Company's delayed filing of its Annual Report on Form 10-K for the fiscal year ended December 21, 2006, information regarding a potential Company liability and updated information regarding the share ownership of Qiong Wang and Bo Chen, the company's prior and current chief executive officers.

Bodisen Anticipates Notice of Delisting

As previously disclosed, on November 6, 2006 the Company received notice from the Amex indicating that the Company was below certain of the Exchange's continued listing standards, specifically alleging that the Company had failed to comply with Sections 132(a), 132(e) and 403 of the Amex Company Guide. The Company was afforded the opportunity to submit a plan of compliance to the Amex. On November 21, 2006, the Company timely submitted such a plan to the Amex, and the Company provided the Amex with subsequent updates.

\* \* \*

Under the specific terms of the plan, the Company was required to provide certain information to the Amex through periodic updates. *The Company has been unable to provide all such definitive information to the Amex within the applicable time period*. Accordingly, the Company expects to soon receive formal notice from the Amex indicating the Amex's intent to strike the Company's common stock from listing on the Amex by filing a delisting application with the Securities and Exchange Commission. The Company will report the details of such notice if and when it is received.

The Company's failure to file its Annual Report on Form 10-K with the Securities and Exchange Commission when due could serve as an additional basis for Amex to commence delisting proceedings. As discussed further below, the Company has delayed the filing of its Annual Report on Form 10-K for the fiscal year ended December 31, 2006.

\* \* \*

**Bodisen Updates Information Regarding Stock Ownership**

As part of its previously announced internal review, the Company is providing updated information regarding the share ownership of Qiong Wang and Bo Chen, its prior and current chief executive officers, as well as information regarding claims that third parties may have that they are entitled to stock in the Company. The Company has not determined whether or not the updated information impacts the Company's capitalization or creates a previously unstated Company liability.

In September 2005, Qiong Wang and Bo Chen made stock transfers to individuals identified as their children. The Company also understands that the children made substantial stock transfers shortly thereafter to persons residing in the People's Republic of China on whose behalf the shares were held by Ms. Wang, Mr. Chen and the children.

The Company understands that some or all of the 19 stockholders of Bodisen International, Inc. (which, prior to the "reverse merger", was the parent of what now is the Company's principal operating subsidiary) who received stock in the "reverse merger" held at least a portion of such shares on behalf of additional persons residing in China, with respect to which transfers have not yet been made. The exact nature and extent of these interests are not yet known, including whether they support claims against individual stockholders or, in contrast, claims against the Company. As a result, at this time, the Company cannot eliminate the possibility that, to the extent such interests exist and support claims against the Company, they would constitute a material liability or materially impact the capitalization of the Company.

As a result of the reverse merger and after giving effect to the 3-for-1 stock dividend paid in 2004, these 19 stockholders originally held of record 12,000,000 shares of the Company's common stock, of which Ms. Wang was the record holder of 3,748,780 shares and Mr. Chen was the record holder of 3,584,096 shares. According to the records of the Company's transfer agent, Qiong Wang currently is record holder of 720,000 shares of the Company's common stock and Bo Chen currently is record holder of 690,000 shares of the Company's common stock. According to the records of the Company's transfer agent, the children of Qiong Wang and Bo Chen currently together hold 2,639 shares.

102.    Following delisting on the AMEX, while shares were frozen in the U.S., shares listed in London on the AIM continued to trade lower, collapsing over 63% in the single trading day to the equivalent of approximately US$1.00 per share.

103.    On March 24, 2007, the *Wall Street Journal* reported on the Bodisen stock disaster, then reporting that *The Journal* had also discovered other undisclosed adverse information about the Company, including the company's failure to keep track of who owns shares that originally were controlled by its current and former CEOs.

104.    It was not until March 27, 2007, however, that investors finally learned the truth about Bodisen after the Company published a release informing investors that the Company had received a Notice of Delisting, and after Defendants reported AMEX's "Basis for Delisting," as detailed above in ¶ 30. The Company, in an apparent concession of the accuracy of the AMEX letter detailing reasons for the delisting.

105.    On March 28, 2007, the Individual Defendants also announced that they would *not* appeal the American Stock Exchange's decision to de-list the Company.

### Post Class Period Events and Developments

106.    On April 1, 2007, *Market News Publishing* reported that, effective April 2, 2007, Bodisen would move from the American Stock Exchange to the Over the Counter Market. The following day, April 2, 2007, shares of the Company opened trading on the OTC exchange at $0.50 per share – down almost 85% – before closing the day at $1.75 per share, a decline of 50% compared to Bodisen's prior closing price of $3.36 per share.

107.    On June 11, 2007, Defendant Yiliang Lai resigned from the Company, effective June 4, 2007.

108.    Later, on July 24, 2007, when the Company reported results for 1Q:07, Bodisen posted a 52.5% decline in sales for the quarter and a 53.0% decline in gross profit. According to a statement made by the Company, in part, "[t]he significant decrease in revenue was due to the negative impact on the company's reputation as a result of Bodisen being delisted by American Stock Exchange…."

109.    On this news, shares of the Company traded to a low of just above $1.00 per share on July 24, 2007.

110.    As investors now know, Defendants concealed the true operational and financial condition of Bodisen, and materially misrepresented and failed to disclose the conditions that were adversely affecting the Company throughout the Class Period because: (i) it deceived the investing public regarding Bodisen's business, operations, management and the intrinsic value of Bodisen common stock; (ii) it enabled Defendants to artificially inflate the price of Bodisen shares; (iii) it enabled Bodisen insiders to sell millions of dollars of Company stock, as well as

millions of dollars of their privately-held Bodisen shares while in possession of material adverse non-public information about the Company; and (iv) it caused Plaintiff and other members of the Class to purchase Bodisen common stock at artificially inflated prices.

## CAUSATION AND ECONOMIC LOSS

111.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market, and a course of conduct that artificially inflated Bodisen's stock price and operated as a fraud and deceit on Class Period purchasers of Bodisen stock, by misrepresenting the Company's financial results. Over a period of approximately twelve months, Defendants improperly inflated the Company's financial results. Ultimately, however, when Defendants' prior misrepresentations and fraudulent conduct came to be revealed and were apparent to investors, shares of Bodisen declined precipitously, eradicating the prior artificial inflation in the price of Bodisen's shares. As a result of their purchases of Bodisen stock during the Class Period, Plaintiff and other members of the Class suffered economic losses, *i.e.* damages under the federal securities laws.

112.    By improperly characterizing the Company's financial results and misrepresenting its prospects, the Defendants presented a misleading image of Bodisen's business and future growth prospects. During the Class Period, Defendants repeatedly emphasized the ability of the Company to monitor and control Bodisen's compliance with federal and/or state securities laws, as well as AMEX requirements, appropriately oversee the actions and activities of its consultants, agents, and advisors, and consistently reported financial results well within expectations. These claims caused and maintained the artificial inflation in Bodisen's stock price throughout the Class Period and until the truth about the Company was ultimately revealed to investors.

113.    Defendants' false and materially misleading statements had the intended effect of causing Bodisen's shares to trade at artificially inflated levels throughout the Class Period, reaching a Class Period high of over $20.00 per share in late-January 2006.

114.    On November 12-14, 2006, however, as investors learned the truth about the Company, and learned that Defendants had failed to report Bodisen's true ownership and failed to properly report the Company's financial and operational results, and as investors learned that Bodisen was being investigated by the AMEX, shares of the Company collapsed. Defendants' belated disclosures had an immediate, adverse impact on the price of Bodisen shares.

115.    These belated revelations also evidenced Defendants' prior falsification of Bodisen's business prospects due to their publication and dissemination of materially false and misleading statements. As investors and the market ultimately learned, the Company's prior business prospects had been overstated as were the Company's results of operations. As this adverse information became known to investors, the prior artificial inflation began to be eliminated from Bodisen's share price and Plaintiff and other members of the Class were damaged as a result of the related share price decline.

116.    As a direct result of investors learning the truth about the Company between November 12 and 14, 2006, Bodisen's stock price collapsed to below $6.00 per share, from above $10.00 per share, a decline of over 40% on very heavy trading volume of over 6 million shares, over 25 times the average daily trading volume. This dramatic share price decline eradicated much of the artificial inflation from Bodisen's share price, causing real economic loss to investors who purchased this stock during the Class Period.

117.    The decline in Bodisen's stock price at the end of the Class Period was a direct result of the nature and extent of Defendants' fraud being revealed to investors and to the market.

118.    The economic loss, *i.e.* damages suffered by Plaintiff and other members of the Class, was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Bodisen's stock and the subsequent significant decline in the value of the Company's shares when Defendants' prior misstatements and other fraudulent conduct was revealed. The artificial inflation in the price of Bodisen shares throughout the Class Period and the dramatic decline in the price of Company shares when the truth about Bodisen was ultimately revealed is evidenced by the chart below:



**DEFENDANTS' VIOLATION OF GAAP AND SEC RULES**

119. During the Class Period, Defendants represented that Bodisen's financial statements when issued were prepared in conformity with GAAP, which are recognized by the accounting profession and the SEC as the uniform rules, conventions and procedures necessary to define accepted accounting practice at a particular time. Defendants, however, materially misled the investing public, thereby inflating the price of the Company's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. In this regard, the Company used improper accounting practices in violation of GAAP and SEC reporting requirements, in that they failed to disclose material adverse information and misrepresented the truth about the Company, its financial performance, accounting, reporting, and financial condition in violation of the federal securities laws and GAAP. Defendants caused the Company to violate GAAP and SEC rules by, among other things:

      A.     failing to disclose material related party transactions;

      B.     failing to review and reconcile its shareholders ownership records with those of its transfer agent to ensure that its SEC filings and public disclosures were accurate; and

      C.     failing to establish and maintain adequate internal accounting controls.

120. As set forth in Financial Accounting Standards Board ("FASB") Statement of Financial Accounting Concepts ("Concepts Statement") No. 1 (November 1978), one of the fundamental objectives of financial reporting is that it provide accurate and reliable information concerning an entity's financial performance during the period being presented. Concepts Statement No. 1, paragraph 42, states:

> Financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance.

121. As set forth in SEC Rule 4-01(a) of SEC Regulation S-X, "[f]inancial statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1). Management is responsible for preparing financial statements that conform with GAAP. As noted by the AICPA professional standards:

> financial statements are management's responsibility . . . . [M]anagement is responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, record, process, summarize, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities and equity are within the direct knowledge and control of management . . . . Thus, the fair presentation of financial statements in conformity with Generally Accepted Accounting Principles is an implicit and integral part of management's responsibility.

**Defendants' Improper Failure To Disclose**
**Material Related Party Transactions**

122. Defendants violated GAAP and SEC rules by failing to disclose in the Company's financial statements material related party transactions. As the AMEX has now determined, before and during the Class Period, Defendants engaged in various material related party and self-dealing transactions that were not disclosed in its financial statements. In this regard, the Company disclosed in its November 12, 2006 press release that:

> Amex believes that the Company made insufficient or inaccurate disclosure in its public filings with regard to its relationship with, and payments to, a consultancy firm and its affiliates both prior to and subsequent to its listing on the Amex. Additionally, in the

context of the Company's relationship with the consultancy firm, Amex expressed concern that the Company has internal control issues related to its accounting and financial reporting obligations.

123.    In FASB's Statement of Financial Accounting Standard ("SFAS") No. 57, *Related Party Disclosures*, GAAP provides guidance on disclosures of transactions between related parties.[3]    SFAS No. 57 states that an "enterprise's financial statements may not be complete without additional explanations of and information about related party transactions and thus may not be reliable."    Accordingly, SFAS No. 57 requires that financial statements identify material related party transactions and disclose (a) the "nature of the relationship(s)," (b) a "description of the transactions," (c) the "dollar amount of transactions for each period for which an income statement is presented," and (d) the "[A]mounts due from or to the related parties as of the date of each balance sheet."[4]    (Emphasis added.)

124.    In addition, as noted in the SEC's SAB Topic 4E, GAAP provides that:

> [I]n some cases, the significance of an amount may be independent of the amount involved.    For example, amounts due to and from officers and directors, because of their special nature and origin, ought generally to be set forth separately [in financial statements] even though the dollar amounts involved are relatively small.

125.    Defendants knew that, in gross violation of GAAP and SEC rules, these material related party transactions were not disclosed in Bodisen's financial statements during the Class Period.    Defendants also knew that, by failing to do so, the Company's financial statements during the Class Period violated GAAP and were materially false and misleading.

**Defendants Failed to Maintain an**

---

[3] Pursuant to SFAS No. 57, related party transactions include transactions between an enterprise and its principal owners, management, members of the immediate family and affiliates.

[4] Pursuant to SFAS No. 57, disclosure of compensation arrangements that are not in the ordinary course is necessary for users to understand financial statements.

## Adequate System of Internal Controls

126.    In addition to the foregoing improper accounting practices, the Company also suffered from a chronic and systematic breakdown of its internal accounting controls throughout the Class Period, which rendered Bodisen's financial reporting inherently corrupt, subject to manipulation and unreliable, and this resulted in materially false and misleading financial statements.    In this regard, Defendants disclosed in Bodisen's 2006 10-KSB the basis for delisting the Company's common stock, as determined by the AMEX staff and as set forth in the March 22, 2007 notice from the AMEX:

> Bodisen has internal control weaknesses related to its accounting and financial reporting obligations which rise to the level of a public interest concern.    Based on information received by the Staff, the Company failed to consistently review and reconcile its shareholders ownership records with those of its transfer agent to ensure that its SEC filings and public disclosures were accurate.    In this regard, the Company continuously reported in its SEC filings since listing on the Amex that certain officers either directly or indirectly held an aggregate of 40% ownership in the Company's common stock, notwithstanding that its transfer agent records were inconsistent with such reports and disclosures.    Further, by failing to reconcile these records, the Company may have inaccurately reported its capitalization.

127.    Under GAAP, a Company must disclose the following for each class of capital stock: (a) shares authorized, issued, and outstanding; (b) par value or stated value; and (c) the number of shares reserved for future issuance and the purpose for such reservation.    *See* SFAS No. 128, *Earnings Per Share*, (Feb. 1997); SFAS No. 129, *Disclosure of Information about Capital Structure*, (Feb. 1997).

128.    Moreover, GAAP requires that:

> When both financial position and results of operations are presented, disclosure of changes in the separate accounts comprising stockholders' equity (in addition to retained earnings) and of the changes in the number of shares of equity securities during at least the most recent annual fiscal period and any

> subsequent interim period presented is required to make the
> financial statements sufficiently informative.

APB Opinion No. 12, *Omnibus Opinion-1967* ¶ 10 (Dec. 1967).

129. Despite the foregoing GAAP requirements, Defendants did not design or implement internal controls systems to review and reconcile its shareholders ownership records with those of its transfer agent to ensure that its SEC filings and public disclosures were accurate.

130. Additionally, Defendants failed to design and implement an internal control system over the Company's financial reporting processes allowing Defendants to omit disclosing material related party transactions in accordance with GAAP. In this regard, the AMEX determined that "[t]he Company provided incomplete, inaccurate and/or misleading information related to its relationship with, and payments to, a consultancy firm and its affiliates prior to and subsequent to its listing on the Amex in applicable registration statements and periodic financial filings."

131. Section 13(b)(2) of the Exchange Act states, in pertinent part, that every reporting company must: (A) make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflect the transactions and disposition of the assets of the issuer; and (B) devise and maintain a system of internal controls sufficient to provide reasonable assurances that transactions are recorded as necessary to permit the preparation of financial statements in conformity with GAAP. These provisions require an issuer to employ and supervise reliable personnel, to maintain reasonable assurances that transactions are executed as authorized, to properly record transactions on an issuer's books and, at reasonable intervals, to compare accounting records with physical assets.

132.  Defendants violated Section 13(b)(2)(A) of the Exchange Act by failing to maintain accurate records concerning material related party transactions and shareholders' ownership records.  The inaccuracy and falsity of Bodisen's records were not isolated or unique instances because they were improperly maintained for multiple reporting periods.  Indeed, according to the AMEX, "the Company continuously reported in its SEC filings since listing on the Amex that certain officers either directly or indirectly held an aggregate of 40% ownership in the Company's common stock, notwithstanding that its transfer agent records were inconsistent with such reports and disclosures."  Additionally, the AMEX noted that Defendants made "insufficient or inaccurate disclosure in its public filings with regard to its relationship with, and payments to, a consultancy firm and its affiliates both prior to and subsequent to its listing on the Amex."  Accordingly, Defendants violated Section 13(b)(2)(A) of the Exchange Act.

133.  In addition, Defendants violated Section 13(b)(2)(B) of the Exchange Act by failing to implement procedures reasonably designed to prevent accounting irregularities.  Defendants failed to put into place proper reviews and checks to ensure that its management did not engage in accounting improprieties.  It failed to ensure that transactions were reported in accordance with its own policies and with GAAP.  Accordingly, Defendants violated Section 13(b)(2)(B) of the Exchange Act.

134.  Bodisen's lack of adequate internal controls rendered Bodisen's Class Period financial reporting inherently unreliable and precluded the Company from preparing financial statements that complied with GAAP and SEC Regulations.

**Additional GAAP Violations**

135.  As a result of the foregoing, Defendants caused Bodisen's reported financial results to violate, among other things, the following provisions of GAAP for which each Defendant is necessarily responsible:

a)  The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements (APB No. 28, *Interim Financial Reporting* ¶ 10 (May 1973));

b)  The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (FASB Concepts Statement No. 1, ¶ 34);

c)  The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources (FASB Concepts Statement No. 1, ¶ 40);

d)  The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Concepts Statement No. 1, ¶ 50);

f)  The principle that financial reporting should be reliable in that it represents what it purports to represent.  That information should be reliable as well as relevant is a notion that is central to accounting (FASB Concepts Statement No. 2, *Qualitative Characteristics of Accounting Information* ¶¶ 58-59 (May 1980));

g)  The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions (FASB Concepts Statement No. 2, ¶ 79); and

h)  The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered.  The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Concepts Statement No. 2, ¶¶ 95, 97).

**DEFENDANT KABANI'S PARTICIPATION IN THE FRAUD AND ITS SCIENTER**

136. Defendant Kabani & Company, Inc. is a firm of certified public accountants, auditors, and consultants based in Los Angeles, California. Kabani's website states that:

> Kabani & Company, Inc., is a growing public accounting and consulting firm based in Orange county, California. We have built a solid reputation for providing quality service and expertise to all sizes of public and private companies in a variety of industries, including High-Tech, manufacturing, service, financial, hospitality and entertainment. We are serving clients which are based in North America, Europe & Asia. Our Goal is to provide the highest quality services to entrepreneurial business by offering innovation solutions for complex business transactions.

137. Through its various California offices Kabani served as Bodisen's auditor and principal accounting firm from February 26, 2004 through July 30, 2007. Kabani was required to audit the Company's financial statements in accordance with Generally Accepted Auditing Standards ("GAAS")[5], and to report the audit results to Bodisen, the board of directors, the audit committee, and the members of the investing public, including plaintiff and other members of the Class. With knowledge of Bodisen's true financial condition, or in reckless disregard thereof, Kabani certified the materially false and misleading financial statements of Bodisen, described below and provided unqualified Independent Auditors' Reports, which were included in the SEC filings and publicly disseminated statements. Without these materially false and misleading unqualified audit opinions, the fraud alleged above could not have been perpetrated.

**Kabani Had Full, Complete and Intimate Knowledge of Bodisen's Information**

---

[5] GAAS, as approved and adopted by the American Institute of Certified Public Accountants ("AICPA")' relate to the conduct of the individual audit engagements. Statements on Auditing Standards (codified and referred to as AU § __) are recognized by the AICPA as the interpretation of GAAS.

138.  Kabani, by virtue of its relationship with Bodisen and the nature of the auditing and consulting services, rendered to the Company, including participating in due diligence events with institutional investors, had full, complete and intimate knowledge of Bodisen's information.  For example, according to a Bodisen press release dated October 18, 2004:

> U.S. and European institutions and fund managers completed a successful visit to Bodisen in China.  During the two day on-site due diligence of Bodisen, institutions and fund managers were joined by the President of Kabani & Co., Bodisen's U.S. GAAP auditing firm.  The two day due diligence included meetings and visits with Bodisen's management team, customers, suppliers, product distribution centers, manufacturing facilities, research labs, new manufacturing facilities and local government officials.
>
> The meetings were held to satisfy increasing interest in Bodisen from institutional investors as a result of the company's recent road show in the U.S. and Europe, and included senior executives from New York City-based Westminster Securities, Wall Street firm New York Global Securities through its Beijing office and affiliates, former executives from Societe Generale and Royal Bank of Scotland and London-based investment banking firm Teathers & Greenwood.  The institutions and fund managers visiting Bodisen were also joined by the President of Kabani & Co, which is the third largest independent auditing firm in Southern California, representing approximately 50 U.S. public companies.

139.  Kabani's personnel were regularly present at Bodisen and had intimate knowledge of Bodisen's financial reporting practices based on its access to confidential internal corporate, financial, operating and business information, knew of or recklessly disregarded the following adverse facts concerning the Company's improper financial reporting and corrupt internal controls during the Class Period, including the Company's December 31, 2003, 2004, and 2005 year-end financial statements and Kabani's unqualified audit opinions thereon.  Nonetheless, Kabani knowingly, or recklessly, issued false unqualified audit opinions during the Class Period.

**Kabani Failed to Render an Accurate Audit Report**

140.   Kabani violated GAAS Standard of Reporting No. 1 that requires the audit report to state whether the financial statements are presented in accordance with GAAP.   AU § 508.04.   Kabani's opinions falsely represented that Bodisen's December 31, 2003, 2004, and 2005 year-end financial statements were presented in conformity with GAAP when they were not for the reasons herein alleged.

141.   The auditor's report must express an opinion on the financial statements taken as a whole and must contain a clear indication of the character of the auditor's work.   The auditor can determine that he is able to express an unqualified opinion only if he has conducted his audit in accordance with GAAS.   AU § 508.07.

142.   Kabani did not render an accurate audit report and thus did not exercise due professional care, because Bodisen's financial statements were not in conformity with GAAP, and because Kabani failed to perform sufficient procedures to audit Bodisen's financial statements as of December 31, 2003, 2004, and 2005, in accordance with GAAS.

143.   Kabani issued its audit opinion, dated March 1, 2005, on Bodisen's year ended December 31, 2003 and 2004 financial statements.   Kabani's opinion stated that Bodisen's financial statements were presented in conformity with GAAP and that Kabani's audit was performed in accordance with GAAS[6]:

> To the Board of Directors and Stockholders
>
> Bodisen Biotech, Inc.

---

[6] As a result of Sarbanes-Oxley every public accounting firm that prepares or issues an audit report with respect to any public company must register with the Public Company Accounting Oversight Board ("PCAOB").   On April 16, 2003, the PCAOB adopted certain pre-existing standards as its interim standards to be used on an initial, transitional basis.   Interim Auditing Standards consist of GAAS, as described in the AICPA's Auditing Standards Board's Statement of Auditing Standards No. 95, and related interpretations, as in existence on April 16, 2003, to the extent not superseded or amended by the PCAOB.

We have audited the accompanying consolidated balance sheet of Bodisen Biotech, Inc. (a Delaware corporation) and subsidiaries as of December 31, 2004 and the related consolidated statements of income, stockholders' equity, and cash flows for the years ended December 31, 2004 and 2003. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audit.

We conducted our audits of these statements in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Bodisen Biotech, Inc. and subsidiaries as of December 31, 2004, and the results of its consolidated operations and its cash flows for the years ended December 31, 2004 and 2003 in conformity with accounting principles generally accepted in the United States of America.

/S/ KABANI & COMPANY, INC..

144. Kabani issued its audit opinion, dated February 22, 2006, on Bodisen's year ended December 31, 2004 and 2005 financial statements. Kabani's opinion stated that Bodisen's financial statements were presented in conformity with GAAP and that Kabani's audit was performed in accordance with GAAS:

Board of Directors and Stockholders of

Bodisen Biotech, Inc.

We have audited the accompanying consolidated balance sheet of Bodisen Biotech, Inc. (a Delaware corporation) and subsidiaries as of December 31, 2005, and the related consolidated statements of income and other comprehensive income, stockholders' equity, and

cash flows for the years ended December 31, 2005 and 2004. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall consolidated financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Bodisen Biotech, Inc. and Subsidiaries as of December 31, 2005, and the consolidated results of their operations and their consolidated cash flows for the years ended December 31, 2005 and 2004, in conformity with U.S. generally accepted accounting principles.

/s/ Kabani & Company, Inc.

145.  In issuing such audit opinions, Kabani turned a blind eye to Bodisen's improper accounting practices and corrupt internal controls, as described herein, and issued unqualified audit opinions on Bodisen's year ended December 31, 2003, 2004, and 2005 financial statements, even though Kabani knew or recklessly disregarded that: (a) the financial statements had not been prepared in conformity with GAAP in numerous respects and did not present fairly, in all material respects, the financial position of Bodisen and its subsidiaries as of December 31, 2003, 2004, and 2005, and the results of their operations and cash flow for the years ended December 31, 2003, 2004, and 2005 and (b) Kabani had not audited Bodisen's year ended 2003, 2004, and 2005 financial statements in accordance with GAAS.  As detailed

- the failure to disclose material related party transactions in contravention of GAAP and SEC reporting requirements;

- the failure to review and reconcile its shareholders ownership records with those of its transfer agent to ensure that its SEC filings and public disclosures were accurate; and

- the failure to establish and maintain adequate internal accounting controls.

### The Failure To Disclose Related Party Transactions

146. Kabani ignored that "evidence of significant or extensive undisclosed related party transactions" is indicative of a significant deficiency in the design or operation of internal control that could adversely affect Bodisen's "ability to record process, summarize, and report financial data consistent with the assertions of management in the financial statements." AU § 325.21.

147. According to the AICPA's Accounting and Auditing for Related Parties and Related Party Transactions, A Toolkit for Accountants and Auditors:

> Reliable and transparent financial reporting is particularly important in this troubled environment. This requires the special attention of CPAs to work together with management and audit committees, when applicable, to ensure that related parties and related party transactions are identified and that management's disclosure of related party transactions are appropriately and completely disclosed in accordance with GAAP.

148. Once an auditor has identified related party transactions, the auditor should apply the procedures he considers necessary to obtain satisfaction concerning the purpose, nature, and

extent of these transactions and their effect on the financial statements.  AU § 334.09.  The procedures should be directed toward obtaining and evaluating sufficient competent evidential matter and should extend beyond inquiry of management.  AU § 334.09.  As noted by the AMEX, "[t]he Company provided incomplete, inaccurate and/or misleading information related to its relationship with, and payments to, a consultancy firm and its affiliates prior to and subsequent to its listing on the Amex in applicable registration statements and periodic financial filings."  To be sure, Kabani knew or recklessly disregarded the Company's relationship with New York Global, the consultancy firm, as Kabani audited at least two other New York Global affiliated companies.

149.  According to SAB No. 99, "quantitative benchmarks for assessing materiality (*e.g.*, a five percent threshold) do not apply in circumstances involving self-dealing and misappropriation of corporate assets by senior management."

150.  Kabani ignored the guidance under Section 10A of the Securities and Exchange Act which requires the auditor to design procedures "to identify related party transactions that are material to the financial statements or otherwise require disclosure therein . . . ."  In addition, Kabani failed to evaluate all the information available concerning the related party transactions, to determine whether they were adequately disclosed, in accordance with SFAS 57, in the financial statements.  *See* AU § 334.11.

### Kabani Failed to Obtain Sufficient Competent Evidential Matter

151.  During the course of Kabani's audits of Bodisen, there appeared "red flags" which should have raised questions in the auditors' minds and led them to procure additional evidential matter.  In conducting an audit, an auditor must obtain sufficient competent

evidential matter through inspection, observation, inquiries and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit. AU § 326.01.

152. According to an article written by Herb Greenberg, "Checkered Past Of China Firms Advisor" on September 29, 2006:

> Timothy Halter, of Dallas-based Halter Financial, claims to have turned down the Bodisen reverse merger. Halter is such a fan of reverse mergers and Chinese stocks that he created an index called the Halter USX China Index. While he liked Bodisen, "and it seemed like a good business," Halter told me, "our auditor ultimately deemed it un-auditable at the time." Bodisen is not in the index.

(Emphasis added). Indeed, Kabani could not have fulfilled the foregoing responsibilities, because sufficient competent evidential matter did not exist.

153. Additionally, during the course of Kabani's audits of Bodisen, there appeared numerous "red flags" which should have raised questions in the auditors' minds and led them to procure additional evidential matter. For example, Kabani knew or recklessly disregarded that Defendants failed to consistently review and reconcile its shareholders' ownership records with those of its transfer agent to ensure that its SEC filings and public disclosures were accurate. Kabani ignored that evidence of "[m]anagement failing to correct known reportable conditions on a timely basis as a risk factor" or "red flag," because a Company's "failure to perform tasks that are part of internal control, such as reconciliations not prepared or not timely prepared" could "adversely affect [a Company's] ability to initiate, record, process, and report financial data consistent with the assertions of management in the financial statements." AU § 316.85; AU § 325.21.

154. Also, management's lack of integrity should, in turn, have caused Kabani to re-evaluate its risk assessments. GAAS requires that risk assessments, and accordingly, any reevaluations of risk assessments, should be made with consideration of applicable risk factors.

*See* AU §§ 316.12, 316.14.  The auditor's response to a risk assessment should be "influenced by the nature and significance of the risk factors identified as being present."  AU § 316.25.  One of the principal categories of "risk factors that relate to misstatements arising from fraudulent financial reporting" is a "[k]nown history of securities law violations or claims against the entity or its senior management alleging fraud or violations of securities laws."  AU § 316.16.  In this regard, Wei was suspended and fined by the NASD for allegedly maintaining discretionary accounts "with a member firm" without giving his firm notice.  Additionally, on July 13, 2005, Wei entered into an Agreement and Order of Censure with the Oklahoma Department of Securities barring him from, among other things, "request[ing] to register as a broker-dealer, broker-dealer agent, investment adviser, investment adviser representative and/or issuer agent under the Act" for his activities between December 1999 and September 2001.  Although Wei was not officially part of Bodisen management, he exercised direct and significant influence over Bodisen.

155.   As one of the largest audit firms in southern California, Kabani was well aware of the strategies, methods, and procedures required by GAAS to conduct a proper audit.  Also, Kabani knew of the audit risks inherent at Bodisen and the industry in which Bodisen operated because of the comprehensive services it provided to Bodisen.  Kabani's intentional failure to comply with GAAS and Kabani's performance on the Bodisen audit rose to the level of recklessness and/or knowing fraud.

## Kabani Failed to Exercise Due Professional Care

156. Auditors must exercise due professional care in performing the audit and preparing the audit report.  AU § 230.01.  Due professional care concerns what the auditor does and how well he does it.  AU § 230.04.

157.   Kabani did not exercise due professional care because it failed to obtain sufficient competent evidential matter to support the assertions in the financial statements; maintain an attitude of professional skepticism; and render an accurate audit report on behalf of Bodisen.

158.   Kabani violated GAAS Standard of Reporting No. 3 that requires that, informative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report.   Kabani knew or recklessly disregarded that Bodisen's disclosures were not reasonably adequate.

159.   For example, Kabani ignored the fact that Bodisen failed to make adequate disclosures concerning related party transactions.   GAAP provides that the usefulness of financial statements in making economic decisions depends significantly upon the user's understanding of the accounting policies followed by a company.   FASB Concepts Statement No. 6, ¶ 9.

160.   Accordingly, because Bodisen "omit[ted] from the financial statements, including the accompanying notes, information that [was] required by generally accepted accounting principles, [Kabani] should [have] express[ed] a qualified or an adverse opinion and should [have] provide[d] the information in [its] report." AU § 431.03.

161.   Kabani violated GAAS Standard of Reporting No. 4 that requires that, when an opinion on the financial statements as a whole cannot be expressed, the reasons therefore must be stated.   Kabani should have stated that no opinion could be issued by it on Bodisen's December 31, 2003, 2004, and 2005 financial statements or issued an adverse opinion stating that the December 31, 2003, 2004, and 2005 year end financial statements were not fairly presented.

162.   Kabani violated GAAS General Standard No. 2 that requires that independence in mental attitude is to be maintained by the auditor in all matters related to the assignment.

163.   Kabani violated SAS No. 99 in that it failed to adequately consider the risk that the audit financial statements of Bodisen were free from material misstatement, whether caused by errors or fraud.   Kabani knew or recklessly ignored numerous risks relevant to financial reporting including events and circumstances that occurred or existed at Bodisen during the Class period, which adversely affected Bodisen's ability to initiate, record, process, and report financial data consistent with the assertions of management in the financial statements.   These events or circumstances include, but are not limited to:

- Changes in operating environment.   Changes in the regulatory or operating environment can result in changes in competitive pressures and significantly different risks.

- New or revamped information systems.   Significant and rapid changes in information systems can change the risk relating to internal control.

- Rapid growth.   Significant and rapid expansion of operations can strain controls and increase the risk of a breakdown in controls.

- New technology.   Incorporating new technologies into production processes or information systems may change the risk associates with internal control.

- New business models, products, or activities.   Entering into business areas or transactions with which an entity has little experience may introduce new risks associated with internal control.

- Corporate restructurings.   Restructurings may be accompanied by staff reductions and changes in supervision and segregation of duties that may change the risk associated with internal control.

- Expanded foreign operations.   The expansion or acquisition of foreign operations carries new and often unique risks that may affect internal control, for example, additional or changed risks from foreign currency transactions.

- New accounting pronouncements.   Adoption of new accounting principles or changing accounting principles may affect risks in preparing financial statements.

164.   Kabani violated GAAS and the standards set forth in SAS No. 1 and SAS No. 53 by, among other things, failing to adequately plan its audit and properly supervise the work of assistants and to establish and carry out procedures reasonably designed to search for and detect the existence of errors and irregularities that would have a material effect upon the financial statements.

165.   Kabani violated GAAS Standard of Field Work No. 2, which requires the auditor to make a proper study of existing internal controls, including accounting, financial and managerial controls, to determine whether reliance thereon was justified, and if such controls are not reliable, to expand the nature and scope of the auditing procedures to be applied.  The standard provides that a sufficient understanding of an entity's internal control structure be obtained to adequately plan the audit and to determine the nature, timing and extent of tests to be performed.  AU § 150.02.  In all audits, the auditor should perform procedures to obtain a sufficient understanding of three elements of an entity's internal control structure:  the control environment, the accounting system, and control procedures.  AU § 319.02.

166.   As a result of its failure to accurately report on Bodisen's fiscal 2003, 2004, and 2005 financial statements, Kabani utterly failed in its role as an auditor as defined by the SEC. SEC Accounting Series Release No. 296, Relationships Between Registrants and Independent Accountants, Securities Act Release No. 6341, Exchange Act Release No. 18044, states in part:

> Moreover, the capital formation process depends in large part on the confidence of investors in financial reporting.  An investor's willingness to commit his capital to an impersonal market is dependent on the availability of accurate, material and timely information regarding the corporations in which he has invested or proposes to invest.  The quality of information disseminated in the securities markets and the continuing conviction of individual investors that such information is reliable are thus key to the formation and effective allocation of capital.  Accordingly, the audit function must be meaningfully performed and the

> accountants' independence not compromised. The auditor must be free to decide questions against his client's interests if his independent professional judgment compels that result.

167. Kabani's opinions, which represented that Bodisen's December 31, 2003, 2004, and 2005 year end financial statements were presented in conformity with GAAP, were materially false and misleading because Kabani knew or was reckless in not knowing that Bodisen's December 31, 2003, 2004, and 2005 year end financial statements violated the principles of fair reporting and GAAP. In the course of rendering its unqualified audit certification on Bodisen's December 31, 2003, 2004, and 2005 year end financial statements, Kabani knew it was required to adhere to each of the herein described standards and principles of GAAS, including the requirement that the financial statements comply in all material respects with GAAP. Kabani, in issuing its unqualified opinions, knew or recklessly disregarded that by doing so it was engaging in gross departures from GAAS, thus making its opinions false, and issued such certifications knowing or recklessly disregarding that GAAS had been violated.

168. Kabani knew or recklessly disregarded facts that indicated that it should have: (a) disclaimed or issued adverse opinions on Bodisen's December 31, 2003, 2004, and 2005 year end financial statements; or (b) withdrawn, corrected or modified its opinion for the years ended December 31, 2003, 2004, and 2005 to recognize Bodisen's improper accounting and financial reporting stated above.

## ADDITIONAL SCIENTER ALLEGATIONS

169. As alleged herein, Defendants acted with scienter in that each Defendant knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or

acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Bodisen, their control over, and/or receipt and/or modification of Bodisen's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Bodisen, participated in the fraudulent scheme alleged herein.

170.    The Complaint's allegations also support a strong inference of scienter through the allegations regarding the AMEX delisting. These allegations are particularly compelling as Defendants failed to appeal the AMEX findings. As discussed in detail elsewhere herein, the AMEX notice officially delisting Bodisen on March 22, 2007, concludes that the Company actions "constitute[e] material violations of federal and/or state securities laws." The AMEX's findings include:

> The following is the basis for delisting the Company's common stock as determined by the Amex staff and as set forth in the March 22, 2007 notice from the Amex. The Company is required under applicable SEC and Amex provisions to disclose the rules upon which a delisting is sought and the specific continued listing deficiencies upon which the delisting is based….
>
> "A. Bodisen failed to comply with its Securities and Exchange reporting obligations by filing incomplete, misleading and/or inaccurate information in its public filings through the SEC's Electronic Data Gathering Analysis and Retrieval ('EDGAR') system. The Company's actions in this regard raise significant public interest concerns as well as constituting material violations of federal and/or state securities laws. Specifically:
>
> 1.    The Company's SEC filings contained incomplete, misleading and/or inaccurate disclosures regarding the beneficial ownership of its securities by certain officers and directors on several occasions, prior to and subsequent to its listing on the Amex. These officers and directors knew or should have known that certain filings including Forms 3, Forms 10KSB and 10KSB/A for the periods ended December 31, 2004 and 2005 and the Form DEF 14-A filed on December

1, 2006 were incomplete, misleading and/or inaccurate yet failed to update and/or correct the relevant disclosures contained therein in subsequent SEC filings.

2.    The Company's disclosures in applicable registration statements and periodic financial filings with respect to the net proceeds from the February 3, 2006 Placing Agreement related to its listing on the AIM Market of the London Stock Exchange, and the offering costs and expenses related to its March 15, 2006 private placement were incomplete, inaccurate and/or misleading.

3.    The Company provided incomplete, inaccurate and/or misleading information related to its relationship with, and payments to, a consultancy firm and its affiliates prior to and subsequent to its listing on the Amex in applicable registration statements and periodic financial filings.

Based on the foregoing, Staff has determined that the Company is not in compliance with Sections 132(a), 134, and 1101 of the Company Guide. In addition, due to the public interest concerns, the Company is subject to suspension from dealings on the Exchange pursuant to Sections 127 and 1003(f)(iii) of the Company Guide."

"B. The Company failed to provide public clarification to rumors and/or reports related to the filing of various Forms 144 between August 1, 2006 through December 1, 2006. Specifically, notwithstanding articles in the press concerning the filing of numerous Forms 144, the Company failed to make appropriate public disclosure addressing the concerns related to the transfer or sales of common stock by insiders and apparent inconsistencies with prior public disclosure of controlling stock ownership, as required by Sections 132(a), 401(a), 402(a) and 403 of the Company Guide."

"C. Bodisen failed to provide information and documents reasonably requested by the Staff related to the beneficial ownership of the Company's securities held by certain officers and directors as required by Section 132(e) of the Company Guide. Further, Bodisen has been unable to provide written updates to the Staff as required pursuant to the terms of the acceptance of the Company's plan or written responses to the Staff's information request dated March 16, 2007, as required by Section 132(e) of the Company Guide."

"D. Bodisen has internal control weaknesses related to its accounting and financial reporting obligations which rise to the level of a public interest concern. Based on information received by the Staff, the Company failed to consistently review and reconcile its shareholders ownership records with those of its transfer agent to ensure that its SEC filings and public disclosures were accurate. In this regard, the Company continuously reported in its SEC filings since listing on the Amex that certain officers either directly or indirectly held an aggregate of 40% ownership in the Company's common stock, notwithstanding that its transfer agent records were inconsistent with such reports and disclosures. Further, by

failing to reconcile these records, the Company may have inaccurately reported its capitalization. Accordingly pursuant to Sections 127 and 1003(f)(iii) of the Company Guide the Company is subject to suspension from dealings on the Exchange."

"The deficiencies described above evidence that the Company has engaged in a pattern and practice of non-compliance with Amex listing requirement encompassing a broad range of qualitative and corporate governance concerns as well as violations of applicable federal and/or state securities laws, which collectively rise to the level of a public interest concern and subject Bodisen to delisting pursuant to Sections 127 and 1003(f)(iii) of the Company Guide. In this regard, notwithstanding that it is the responsibility of management and the board of directors to ensure that the Company operates in compliance with all applicable laws, rules and regulations, the Company has evidenced that it is unable to (i) effectively monitor its compliance with federal and/or state securities laws, as well as Amex requirements, and (ii) appropriately oversee the actions and activities of its consultants, agents and advisors."

171. As discussed herein, the allegations that support a strong inference of scienter also include allegations that Defendants engaged in large, unreported insider sales; invented fictitious identities for "beneficial owners" in order to conceal the fact that the true beneficial owners of material percentages of the Company's shares outstanding were secretly Defendants or persons or entities controlled by them; the disturbing and concealed connections to Wei and NYGG, and the fact that Defendant Wang indicated that she would "not stand for reelection" after the Class Period for personal reasons.

172. Defendants were motivated to materially misrepresent to the SEC and investors the true financial condition of the Company because: (i) it deceived the investing public regarding Bodisen's business, operations, management and the intrinsic value of Bodisen common stock; (ii) it enabled Defendants to artificially inflate the price of Bodisen shares; (iii) it enabled Bodisen insiders to sell millions of dollars of Company stock, as well as millions of dollars of their privately-held Bodisen shares while in possession of material adverse non-public information about the Company; and (iv) it caused Plaintiff and other members of the Class to purchase Bodisen common stock at artificially inflated prices. In fact, the full scope of

## **PLAINTIFF'S CLASS ACTION ALLEGATIONS**

173.  Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the common stock of Bodisen between November 3, 2005 and November 10, 2006, inclusive (the "Class") and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families, and legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

174.  The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Bodisen common shares were actively traded on the AMEX. As of May 8, 2006, the Company had over 18.176 million shares of common stock issued and outstanding. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Bodisen or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

175.  Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

176.  Plaintiff will fairly and adequately protect the interests of the members of the

Class and has retained counsel competent and experienced in class and securities litigation.

177.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Bodisen; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

178.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**Applicability Of Presumption Of Reliance:**
**<u>Fraud-On-The-Market Doctrine</u>**

179.    At all relevant times, the market for Bodisen's common stock was an efficient market for the following reasons, among others:

(a)    Bodisen's stock met the requirements for listing, and was listed and actively traded, on the AMEX national market exchange, a highly efficient and automated market;

(b)    As a regulated issuer, Bodisen filed periodic public reports with the SEC and the AMEX;

(c)    Bodisen regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Bodisen was followed by multiple securities analysts employed by brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

180.    As a result of the foregoing, the market for Bodisen securities promptly digested current information regarding Bodisen from all publicly available sources and reflected such information in Bodisen stock price.  Under these circumstances, all purchasers of Bodisen common stock during the Class Period suffered similar injury through their purchase of Bodisen common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

181.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the

extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Bodisen who knew that those statements were false when made.

## Additional Allegations Regarding the Individual Defendants

182.    Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets, and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets, and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof, and via reports and other information provided to them in connection therewith.

183.    It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading, and incomplete information conveyed in the Company's public filings, press releases, and other publications as alleged herein are the collective actions of the narrowly defined group of Defendants identified above. Each of the above officers of Bodisen, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels, and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial

statements, and financial condition, as alleged herein. Said Defendants were involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

184.    As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act and was traded on the AMEX, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

185.    The Individual Defendants participated in the drafting, preparation, and/or approval of the various public shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with Bodisen, each of the Individual Defendants had access to the adverse undisclosed information about Bodisen's business prospects, and financial condition and performance as particularized herein and knew or recklessly disregarded that these adverse facts rendered the positive representations

made by or about Bodisen and its business—issued or adopted by the Company—materially false and misleading.

186.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance, and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein, and is therefore primarily liable for the representations contained therein.

187.    Each of the Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Bodisen common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Bodisen's business, operations, management and the intrinsic value of Bodisen common stock; (ii) enabled Defendants to artificially inflate the price of Bodisen shares; (iii) enabled Bodisen insiders to sell millions of dollars of Company stock, as well as millions of dollars of their privately held Bodisen shares while in possession of material adverse non-public information about the Company; and (iv) caused Plaintiff and other members of the Class to purchase Bodisen common stock at artificially inflated prices.

**BASIS OF ALLEGATIONS**

188.    Plaintiff has alleged the following based upon the investigation of Plaintiff's counsel, which included a review of SEC filings by Bodisen, as well as regulatory filings and

reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company; and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **FIRST CLAIM**

**Violation Of Section 10(b) Of
The Exchange Act And Rule 10b-5
Promulgated Thereunder Against All Defendants**

189.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

190.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public regarding Bodisen's business, operations, and management and the intrinsic value of Bodisen common stock; (ii) enable Defendants to artificially inflate the price of Bodisen shares; (iii) enable Bodisen insiders to sell millions of dollars of Company stock, as well as millions of dollars of their privately-held Bodisen shares while in possession of material adverse non-public information about the Company; and (iv) cause Plaintiff and other members of the Class to purchase Bodisen common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, jointly and individually (and each of them) took the actions set forth herein.

191.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Bodisen's common stock in violation of Section

10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

192.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Bodisen as specified herein.

193.    These Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Bodisen's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Bodisen and its business operations and future prospects—in light of the circumstances under which they were made—not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Bodisen common stock during the Class Period.

194.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development, and reporting of the Company's internal budgets,

plans, projections, and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

195.    The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly for the purpose and effect of concealing Bodisen's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its common stock. As demonstrated by Defendants' overstatements and misstatements of the Company's business, operations, and earnings throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by recklessly refraining from taking those steps necessary to discover whether those statements were false or misleading.

196.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Bodisen common stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of Bodisen's publicly-traded common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by

Defendants during the Class Period, Plaintiff and the other members of the Class acquired Bodisen common stock during the Class Period at artificially high prices and were damaged thereby.

197.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Bodisen was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Bodisen common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

198.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

199.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.


### SECOND CLAIM

**Violations Of Section 20(a) Of
The Exchange Act Against Individual Defendants**

200.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

201.    The Individual Defendants acted as controlling persons of Bodisen within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and ownership and contractual rights, participation in and/or awareness of the

Company's operations, and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to, and/or had the ability to prevent the issuance of the statements or cause the statements to be corrected.

202.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

203.    As set forth above, Bodisen and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of

Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.    Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity, and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 and any appropriate state law remedies to assure that the Class has an effective remedy; and

E.    Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: November 16, 2007

Michael A. Swick (MS-9970)
Kim E. Miller (KM-6996)
**KAHN GAUTHIER SWICK, LLC**
12 East 41St Street, 12th Floor
New York, New York 10017
Telephone: (212) 696-3730
Facsimile: (504) 455-1498

William B. Federman (WF-9124)
**FEDERMAN & SHERWOOD**
10205 N. Pennsylvania Ave.
Oklahoma City, OK 73120
Telephone: (405) 235-1560
Facsimile: (405) 239-2112

**Co-Lead Counsel for Plaintiff and the Class**